847 A.2d 23 (2004)
368 N.J. Super. 479
Tadeusz KLUCZYK, Plaintiff-Respondent,
v.
TROPICANA PRODUCTS, INC., Pat Freda and Steve Montalto, Defendants-Appellants, and
Anthony Valiante, Frank Zeleznik, Chris Mueller, Gary Johnson, Randy Woo, Anthony Pittman, Greg Thompson, Edward Riedinger, Bruce Czaja, Al Dinerman, Darrell Root, Jerry Defino, Bobby Mullins, and Eddie Stoeckle, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued October 21, 2003.
Decided April 28, 2004.
*25 Carmine A. Iannaccone, Newark, argued the cause for appellants (Epstein Becker & Green, attorneys; Mr. Iannaccone, of counsel; James P. Flynn, on the brief).
Andrew Dwyer argued the cause for respondent (Dwyer & Dunnigan, attorneys; Mr. Dwyer, of counsel and on the brief).
Before Judges STERN, LEFELT and LANDAU.
*24 The opinion of the court was delivered by STERN, P.J.A.D.
Defendants Tropicana Products, Inc., Patricia Freda and Steve Montalto appeal from a final judgment entered on April 24, 2002, aggregating $816,815.79, based on the jury verdict on plaintiff's claim for retaliatory discharge (but in defendants' favor on all other claims). The jury awarded $90,911.00 for lost past wages, *26 $118,404.00 for lost future wages, $20,000.00 for emotional distress, and $225,000 for punitive damages. The trial judge further awarded $315,547.45 in counsel fees, $33,953.34 in costs, and $13,000 in prejudgment interest. We affirm the judgment in all respects.
Defendants argue that the judgment must be reversed because "(a) the trial court erroneously allowed plaintiff to make legally impossible, factually contradictory claims, (b) the record cannot support a finding of unlawful retaliatory intent, and (c) the trial court improperly admitted irrelevant and prejudicial evidence excludable under [N.J.R.E.] 404(b)." Defendants further contend that the judgment must also be reversed because "the record is incapable of supporting punitive damages and does not include evidence as to other or intervening causes of emotional distress and future financial status." Finally, defendants attack the award of counsel fees based on the lodestar and its enhancement because "plaintiff did not prevail," under the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 et seq., on his "central claims of sexual harassment or any of his claims against most of the defendants."
The trial involved plaintiff's claims of "same-sex sexual harassment" by co-workers and Tropicana's failure to stop it. At the trial, plaintiff also asserted that he was fired in retaliation for taking legal action. The defendants included Tropicana and its employees who were superiors, supervisors and co-workers of plaintiff. Defendant Freda was Tropicana's Director of Northeast Operations, and defendant Montalto was its area Human Resources Director at the time.
In its verdict sheet, the jury found that plaintiff proved, "by a preponderance of the evidence that the defendants engaged in behavior directed at [plaintiff] because of his sex," but not "that [their] behavior was sufficiently severe or pervasive to alter the terms and conditions of his employment and create a sexually hostile work environment at Tropicana." However, the jury also found, in interrogatory number five, that plaintiff proved "by a preponderance of the evidence that Tropicana terminated him on September 1, 1999, in retaliation for his engaging in the protected activity of filing complaints in the Division on Civil Rights and in [the Superior Court in this case]." The jury also found, in response to interrogatory number seven, that plaintiff proved, "by clear and convincing evidence," that defendants Montalto and Freda, but not the thirteen other named defendants, acted "maliciously and with wanton disregard to plaintiff's rights." In response to interrogatory number eight, the jury also found that plaintiff proved "by clear and convincing evidence that defendant Tropicana's conduct (i.e. the harassment and the termination) was either (a) malicious or (b) in wanton and reckless disregard of plaintiff's rights." In response to question number nine, the jury concluded that plaintiff proved, by the same standard, "that Tropicana's upper level management actually participated in" and "willfully acquiesced in the harassment and/or termination of plaintiff." At a separate proceeding, the same jury awarded $225,000 in punitive damages against Tropicana, Freda and Montalto.
Defendants contend that the answers on the verdict sheet are not clear or specific enough to justify the awards. However, irrespective of who prepared the interrogatories,[1] there was no objection to *27 the form of the questions asked, or any request for additional questions to be placed on the form, and hindsight cannot be a basis for concluding that the form was inadequate. See Wade v. Kessler Institute, 172 N.J. 327, 341, 798 A.2d 1251 (2002) (court will not reverse where jury's interrogatories or verdict sheet are adequate as a whole); Mogull v. CB Commercial Real Estate, 162 N.J. 449, 467-68, 744 A.2d 1186 (2000) (reviewing jury interrogatories under "plain error" standard in LAD case); Hutchinson v. Atlantic City Med., 314 N.J.Super. 468, 486, 715 A.2d 348 (App.Div.1998) (no objection to verdict sheet barred challenge on appeal).
While question five did not expressly ask whether Montalto or Freda were involved in the retaliatory discharge, by virtue of the other answers, and the jury's finding with respect to the conduct of "upper management," the jury had to have found that their conduct related to the termination, not to the harassment. Moreover, as they were the only individual defendants found liable for the disregard of plaintiff's rights and they were shown to be "upper management," and because the trial judge instructed that Tropicana could be liable for punitive damages only if one or more of the individual defendants were part of "upper management," Freda and Montalto had to be the "upper management" whose conduct rendered defendant Tropicana liable. Because the evidence supports those findings, and there is no legal error warranting reversal, we affirm the judgment.
In reaching our conclusion, we address only those issues which warrant discussion and recite only the facts necessary for their resolution.

I.
Plaintiff came to the United States from Poland in 1984 when he was about thirty-five years old. In 1995, he was hired by Tropicana as a "warehouseman," and commenced work on the loading dock.
Plaintiff's wife Elizabeth filled out the employment application, but plaintiff signed it. The signature line was just below a certification, which provided in part: "I understand and agree that misrepresentation or omission of the facts called for herein will be sufficient cause for cancellation of consideration for employment or dismissal from the Company's service if I have been employed."
Plaintiff stated on the application that he had received a certificate in "mechanical operations" from a "technical school" in Poland, as well as a certificate from a truck driving school in Connecticut. Plaintiff also stated that he had worked for Champion Sports from October 1986 through August 1994 when he left because he "had a better offer," and that from September 1994 through June 1995, he worked for U.S.A. Coating Protection in Hillside. He further said that he left U.S.A. Coating Protection due to "lack of work."
Commencing in October 1997, plaintiff and his daughter complained about the ridicule plaintiff suffered at the hands of co-workers who simulated homosexual acts and called plaintiff homosexual names. Freda, then Tropicana's Director of Northeastern Operations, and Montalto, its regional Human Resources Manager, conducted meetings designed to prevent the disharmony, and met with members of *28 plaintiff's family. Ultimately, plaintiff was reassigned from the rail dock to the "order pick" department filling orders for various juices. No one was ever disciplined for their misconduct or sexual harassment of plaintiff.[2] However, at a meeting with plaintiff's daughter, Montalto, without objection from Freda, said that if plaintiff retained counsel, "it will not be good for the company and it would not be good for [him]," and that "[i]t would get very ugly. It would get ugly for the company and it would get ugly for [her] father."
In August 1998, plaintiff fell on some spilled juice in the "pick order" department. Plaintiff said that he did not see the juice on the floor because he was nervous and upset after having just been the subject of harassment. The next day, plaintiff returned to work with a note from his doctor stating that plaintiff could not lift heavy objects. In response, plaintiff was transferred to the computer room of the "pick order" department. However, he believed that the mistreatment continued.
On August 21, 1998, plaintiff filed a complaint with the Division on Civil Rights. He asserted that he was "being subjected to hostile environment sexual harassment" by "sexual gestures and comments by co-workers." Nevertheless, plaintiff believed the harassment did not end. He then filed this complaint on December 18, 1998. In addition to alleging that he was being sexually harassed and subjected to words and gestures suggesting he was "a homosexual," he also alleged that his supervisors and the company did nothing to stop it, and he was being penalized in terms of assignments and overtime pay. Among other things, he asserted he had been "forced to endure sexual harassment as a condition of his employment" and that he had been subjected to an "intimidating, hostile, offensive and abusive working environment because of [his] gender." Co-employees were charged with specific violations of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq. Defendants Freda and Montalto, among others, were alleged to have "the authority to control the work environment," and "created and maintained a sexually hostile work environment." In summary, count one of the multi-count complaint asserted that defendants "created and maintained a sexually hostile work environment on the basis of gender" in violation of the LAD. There was also a count alleging that defendants' conduct constituted retaliation within the meaning of the LAD.
Plaintiff was granted a disability leave in April 1999 because he was no longer able to work by virtue of the emotional distress. Dr. Edward Suczewski reported that plaintiff was suffering a disability as the result of anxiety from "the hostile environment he describes as a source of his condition." The doctor gave periodic reports during the leave. The last note, which was written after the doctor saw plaintiff on June 17, 1999, stated that his return to work was "undetermined," and that plaintiff's work environment was the cause of his anxiety and chest pain. He reported that "[t]he environment of [plaintiff's] place of work does not allow for his fulfillment of *29 safe and productive duties." During the two months that plaintiff was initially out of work, no one from Tropicana called him to find out about his condition or return to work.
On June 30, 1999, after submitting another form stating that he still could not work and that he did not know when he would be able to return, plaintiff started working for the Seasons Contracting demolition company. Plaintiff says he took the job because he needed the income, not because he wanted to stop working at Tropicana. He never told Tropicana that he was working for Seasons Contracting. After three to four weeks, Seasons Contracting told plaintiff that the company had "no more work" for him. However, plaintiff did not return to Tropicana because nobody from the company ever "contacted [him]" about going back to work.
In September 1999, plaintiff went to work in Connecticut. According to Elizabeth, she left her own job and took plaintiff to Connecticut because he could not find work in the Bayonne area where they lived, and he was depressed. She made the decision after she had come home from work one day and found plaintiff in the basement with a rope around his neck.
Plaintiff left the Connecticut job because it was physically too demanding. He worked as a handyman for a company called Rosedale Estates for a few months beginning in December 1999. In 2000, plaintiff worked as a mechanic for a company called Gel Spice until his shift was eliminated. At the time of trial, he was working as a maintenance man for a company called Mail Well. Plaintiff testified that he was still employed by Mail Well and that he had not been "suspended" from work there as a result of "leaving work without permission" and without punching out. He also denied having been terminated by Mail Well.
When plaintiff was deposed before trial, he denied that he actually received a certificate from the truck driving school, as stated in the job application. At trial, plaintiff explained his answer by stating that, at the time of his deposition, he was not certain whether he had received the certificate, and because he did not want to lie, he denied it. Plaintiff further testified at trial that he did, in fact, receive the certificate, as he had "found" it following the deposition. Defendants also developed that plaintiff's deposition testimony was inconsistent with the application's statements concerning attendance at a technical school in Poland.
Plaintiff's representation on the application that he left Champion in August 1994 for a "better job" also was untrue. Plaintiff actually collected unemployment compensation after his employment with Champion. Moreover, plaintiff testified that the "better job" never materialized and he only did some part-time work for U.S.A. Coating Protection. When asked point blank "[s]o you never actually were employed by USA Coating Protection during this period," plaintiff answered "no."
Plaintiff was deposed on June 15, 1999, and after it was determined that plaintiff had made misrepresentations on the employment application with respect to his education and employment, Tropicana's Human Resources Counsel, Robert Chiaravalloti, who attended the deposition and testified at the punitive damages hearing, called Montalto and asked him whether any other employee had been terminated in the past for falsifying his or her employment application. After Montalto looked into the matter and reported back to Chiaravalloti that two people previously had been fired for lying on their applications, Chiaravalloti "recommended" that plaintiff be fired and drafted a letter for Montalto's signature informing plaintiff that he was *30 being terminated based on the false application. Plaintiff, however, developed through Montalto's testimony, that Montalto "constructed" the letter "with input from counsel" and "crafted it to use [his] own style," and that he "fired" plaintiff.[3]
On September 1, 1999, Montalto signed and sent the letter to plaintiff stating that plaintiff had refused Montalto's request to meet with him in the presence of a union representative to discuss plaintiff's employment and informing plaintiff that, under the terms of the collective bargaining agreement, he was being summarily discharged based upon the "material misstatements" that he made on his employment application, effective September 3, 1999.
In September 1999, plaintiff amended the complaint to include a claim based on the wrongful retaliatory discharge. He subsequently filed a second amended complaint which included a claim for "constructive discharge" as a result of defendants' "knowingly permitting employment conditions of sexual harassment that were so intolerable that any reasonable person would have resigned."

II.
Defendants insist that the discovery of a false employment application incident to the litigation warrants the discharge. There was, however, no challenge to the lack of specific instructions addressed to the right to terminate because of a misrepresentation in the application, and the issue of pretext was charged at length. Accordingly, we find no basis for disturbing the jury's determination which rejected the contention that plaintiff was discharged for lying on the application.
The issue we must address, however, is whether plaintiff can prevail on his retaliatory discharge claim when the termination occurred during the course of litigation which also included a claim for constructive discharge. We conclude that summary judgment was properly denied, the evidence presented a jury issue, and there is no basis for reversal.
In order to establish a prima facie case of constructive discharge in New Jersey, a plaintiff must establish that "the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." Shepherd v. Hunterdon Center, 174 N.J. 1, 27-28, 803 A.2d 611 (2002), quoting Muench v. Township of Haddon, 255 N.J.Super. 288, 301-02, 605 A.2d 242 (App.Div.1992). As the Supreme Court also put it in Shepherd v. Hunterdon Center, supra, 174 N.J. at 28, 803 A.2d 611:
[C]onstructive discharge requires not merely "severe or pervasive" conduct, but conduct that is so intolerable that a reasonable person would be forced to resign rather than continue to endure it. Jones v. Aluminum Shapes, Inc., 339 N.J.Super. 412, 428, 772 A.2d 34 (App. Div.2001). More precisely, the standard envisions a "sense of outrageous, coercive and unconscionable requirements." Ibid. Simply put, a constructive discharge claim requires more egregious *31 conduct than that sufficient for a hostile work environment claim.
On the other hand, a retaliatory discharge in violation of the LAD can occur even if there was no underlying unlawful harassment. Romano v. Brown & Williamson Tobacco Co., 284 N.J.Super. 543, 548, 665 A.2d 1139 (App.Div.1995). The Romano court found that:
To establish a prima facie case of retaliation under LAD [plaintiff] had to show that 1) he was engaged in a protected activity known to the defendant; 2) he was thereafter subjected to an adverse employment decision by the defendant; and 3) there was a causal link between the two.

[Id. at 548-49, 665 A.2d 1139.][4]
If plaintiff establishes a prima facie case of retaliation, "the defendant must articulate a legitimate, non-retaliatory reason for the decision." Id. at 549, 665 A.2d 1139. "Thereafter the plaintiff must come forward with evidence of a discriminatory motive of the employer, and demonstrate that the legitimate reason was merely a pretext for the underlying discriminatory motive." Ibid.
Plaintiff never formally resigned or quit his employment. Rather, he obtained a disability leave which would have permitted his return. The denial of summary judgment was appropriate because the proffer justified alternative theories of liability based on either a constructive or retaliatory discharge for presentation to a jury. Farina v. Compuware Corp., 256 F.Supp.2d 1033, 1051-52 (D.Ariz.2003) (summary judgment denied on retaliation claim where plaintiff was terminated after letter considering herself constructively discharged; plaintiff made a prima facie case that she was terminated due to retaliation for her EEOC complaint and to avoid a constructive discharge claim). See also Delashmutt v. Wis-Pak Plastics, Inc., 990 F.Supp. 689, 696, 703 (N.D.Ia.1998)(holding that plaintiff's claims of both constructive discharge and retaliation survived summary judgment because there were genuine material issues of fact as to retaliation for complaint of sexual harassment and claim that changed working conditions after filing of harassment complaint would result in resignation).
We conclude that there was at least a jury question as to whether plaintiff had resigned or quit before he received the letter of termination, as well as whether he was in fact terminated because he lied on the job application. In its opening, defendants contended that plaintiff "was terminated September 1st of 1999 for lying on his employment application," and stated in summation that he was not "fired until September 1st of 1999," long after the administrative and Superior Court complaints were filed, but shortly after the false application was discovered.
We agree with defendants that plaintiff could not prevail on both his constructive discharge and wrongful termination theories because they must rely on inconsistent findings. See Wade v. Kessler Institute, supra, 172 N.J. at 342-46, 798 A.2d 1251 (involving Woolley claim and alleged breach of covenant of good faith and fair dealing). However, plaintiff pursued only the harassment and retaliation claims at trial, no issue relating to constructive discharge was presented to the jury and, in *32 any event, he did not prevail on inconsistent theories, of both constructive and retaliatory discharge. Id. at 346, 798 A.2d 1251 ("alternative claims" can be asserted "in an appropriate case" "[w]hen supported by the facts").
So long as the jury did not return inconsistent verdicts, we find no basis for disturbing the judgment. In short, the issue of retaliation was a factual issue, and the jury's verdict finding an unlawful retaliatory discharge "is entitled to great deference." Estate of Roach v. TRW, Inc., 164 N.J. 598, 612, 754 A.2d 544 (2000) (CEPA retaliation case, citing Romano, supra). There was more than sufficient evidence from which the jury could conclude that these defendants retaliated against plaintiff for bringing an action challenging their conduct and that plaintiff was treated differently than others who lied on their application or committed serious violations of company policy, thereby demonstrating that the termination was a mere pretext.

III.
We also reject the defendants' contention that punitive damages can never be awarded when the discharge is premised on the advice of counsel. Here, they assert the termination was based on the advice of counsel, and that the false application warranted the termination. Their contention does not warrant reversal, however, because the advice of counsel is only one factor, not a per se basis, for assessing or deciding whether the termination was in good faith, cf. Sandler v. Lawn A Mat Chem. and Equip. Corp., 141 N.J.Super. 437, 452, 358 A.2d 805 (App. Div.), certif. denied, 71 N.J. 503, 366 A.2d 658 (1976), and there was a factual question as to whether the defendants' action was premised on the advice of counsel or an independent decision to retaliate against plaintiff.
In order to award punitive damages in a discrimination suit under the LAD, a plaintiff must prove: "(1) `actual participation in or willful indifference to the wrongful conduct on the part of upper management' and (2) `proof that the offending conduct [is] especially egregious'." Cavuoti v. New Jersey Transit Corp., 161 N.J. 107, 113, 735 A.2d 548 (1999), quoting Rendine v. Pantzer, 141 N.J. 292, 313, 661 A.2d 1202 (1995). Further, members of upper management are not limited to the chief executive officer, chief operating officer or a member of the board. The issue is "fact sensitive." Id. at 122, 127-29, 661 A.2d 1202.
In Sheetz, Inc. v. Bowles Rice McDavid Graff & Love, PLLC, 209 W.Va. 318, 547 S.E.2d 256 (2001), a legal malpractice action, the Supreme Court of Appeals of West Virginia recently held, in responding to a question certified by a federal court, "that in an employment law civil action, the fact that an employer acted in reliance upon the advice of counsel is not an absolute defense to a claim that the employer acted unlawfully or negligently." Id. at 265. The court stated that "[r]elevant evidence regarding the advice of counsel may be admissible in the trial of an employment law civil action as part of the calculus of evidence that the fact-finder considers in reaching its verdict-including on the issue of punitive damages, where that issue is presented." Id. at 265-66. Consequently, in an employment law case, evidence relating to the advice of counsel may be admissible and considered by the jury in reaching its verdict of punitive damages. Id. at 265-66. See also In re Medical License of Setliff, 645 N.W.2d 601, 607 (S.D. 2002) (citing Sheetz and stating "an attorney's advice is not always an outright defense to wrongful actions"); A.L. Laboratories, Inc., v. Philips Roxane, 803 F.2d 378, 383-84 (8th Cir.1986) (rejecting reliance *33 on advice of counsel based on the facts), cert. denied, 481 U.S. 1007, 107 S.Ct. 1632, 95 L.Ed.2d 206 (1987); Stern Enterprises v. Plaza Theaters I and II, 105 Ohio App.3d 601, 664 N.E.2d 981, 984 (1995) (upholding award of punitive damages for landlord's malicious taking of plaintiff's property, resort to "self-help remedies against the advice of counsel, and [election] to ignore avenues of dispute resolution in spite of legal counsel to the contrary").
"An otherwise valid award of punitive damages will not be set aside unless `manifestly outrageous' or `clearly excessive.'" Smith v. Whitaker, 160 N.J. 221, 242, 734 A.2d 243 (1999) (citations omitted). Because punitive damages are not intended to compensate the plaintiff for his or her injuries, they do not "logically depend on the extent of the injury sustained by an individual plaintiff." Ibid. Rather, the amount is "determined from the perspective of the defendant [and] should be sufficient to serve the purpose of deterring future misconduct" by the defendant. Ibid. On the other hand, while the amount of punitive damages does not depend on the award of a specific amount of compensatory damages or injury to the plaintiff, "the award must bear some reasonable relation to the injury inflicted and the cause of the injury." Id. at 242-43, 734 A.2d 243. See also N.J.S.A. 2A:15-5.9 to 5.17.
Given the evidence pertaining to the threat of retaliation because Montalto told plaintiff's daughter it would not be wise to retain counsel, the handling of plaintiff's complaints and subsequent termination, and the other evidence concerning the treatment of plaintiff as compared to other employees who violated company policy, the jury could properly find "egregious" conduct on the part of defendants. Furthermore, with respect to punitive damages, the judge charged that the jury had to find "that the harassment or retaliation was specially egregious," which he defined at length, and "also ... that at least one of Tropicana's upper management employees actually participated in or [was] willfully indifferent to the wrongful conduct." He also instructed that the jury had to find that Montalto, Freda or any one of two other individual defendants were part of upper management, which he also defined at length, in order to award punitive damages.[5] In addition, the judge instructed that to return an award of punitive damages, the jury had to find one or more of the identified defendants, as part of "upper management," "actually participated in or were willfully indifferent to the harassment or retaliation that occurred," and "engaged in affirmative acts to accomplish the wrongful conduct." He stated, in summary, that:
to award punitive damages against Tropicana you must find by clear and convincing evidence both that defendants engaged in specially egregious conduct and that upper management of Tropicana either actively participated in the wrongful conduct or was willfully indifferent to it.
*34 There was no relevant objection to the charge, and there is no basis to upset the award of punitive damages.[6]

IV.
In Rendine v. Pantzer, 141 N.J. 292, 317, 661 A.2d 1202 (1995), a LAD case, the Supreme Court established "standards" for determining attorney's fees that are "faithful to the Legislature's objective in enacting fee-shifting provisions, while at the same time sharply discouraging collateral litigation of `reasonable fee' issues...." In doing so, the Court's expectation was that fee determinations by trial courts will only be disturbed in the "rarest occasions, and then only because of a clear abuse of discretion." Ibid.
The LAD provides that "the prevailing party may be awarded a reasonable attorney's fee as part of the cost...." N.J.S.A. 10:5-27.1. "Under the LAD and other state fee-shifting statutes, the first step in the fee-shifting process is to determine the `lodestar': the number of hours reasonably expended multiplied by a reasonable hourly rate." Rendine, supra, at 334-35, 661 A.2d 1202. "[T]he trial court's determination of the lodestar amount is the most significant element in the award of a reasonable fee because that function requires the trial court to evaluate carefully and critically the aggregate hours and specific hourly rates advanced by counsel for the prevailing party to support the fee application." Id. at 335, 661 A.2d 1202. See also Packard-Bamberger & Co., Inc., v. Collier, 167 N.J. 427, 447, 771 A.2d 1194 (2001)(concluding after analysis of the lodestar issue that the trial court's award would not be disturbed because that court was in the best position to weigh the "equities and arguments" of the parties). Further, the lodestar can be modified by consideration of factors such as "hours not reasonably expended," the success of the litigation "as compared to the relief sought," and "the risk of non-payment in all cases in which the attorney's compensation entirely or substantially is contingent on a successful outcome." Rendine, supra, 141 N.J. at 335-37, 661 A.2d 1202. It should also be adjusted based on consideration of "the interest to be vindicated in the context of the statutory [or policy] objectives, as well as any circumstances incidental to the litigation that directly or indirectly affected the extent of counsel's efforts." Packard-Bamberger, supra, 167 N.J. at 446, 771 A.2d 1194 (quoting Szczepanski v. Newcomb Med. Ctr., Inc., 141 N.J. 346, 366-67, 661 A.2d 1232 (1995)).
We recognize that "the basic lodestar amount may be an excessive amount if only a partial or limited success is the result," Packard-Bamberger, supra, 167 N.J. at 446, 771 A.2d 1194; that here counsel spent considerable time preparing a sexual harassment and hostile workplace environment case; and that he did not prevail on those theories. Nevertheless, he did prevail on a wrongful termination claim premised on retaliation for his exercising his rights to pursue a claim based on the alleged harassment and hostile environment. It was the termination which resulted in successful litigation and which caused plaintiff's counsel to change his attack to one which included a wrongful discharge claim premised on the work he did incident to the constructive termination and harassment suit.[7] When the *35 "unsuccessful claims are related to the successful claims, either by a `common core of facts' or `related legal theories,' the court must consider the significance of the overall relief obtained to determine whether those hours devoted to the unsuccessful claims should be compensated." Singer v. State, 95 N.J. 487, 500, 472 A.2d 138, cert. denied, 469 U.S. 832, 105 S.Ct. 121, 83 L.Ed.2d 64 (1984) (quoting Hensley v. Eckerhart, 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L. Ed.2d 40, 51 (1983)); compare Baer v. Klagholz, 346 N.J.Super. 79, 786 A.2d 907 (App.Div.2001) (where appellants prevailed in part in a case based on a federal statute), certif. denied, 174 N.J. 193, 803 A.2d 1165 (2002). As the trial judge explained, the evidence overlapped and proof of the harassment claim was necessary to show why defendants retaliated. There was no abuse of discretion in setting the lodestar and enhancing the fee. Rendine, supra, 141 N.J. at 343, 661 A.2d 1202.

V.
We find no basis to comment on the other claims raised by defendant in light of the facts of this case. R. 2:11 3(e)(1)(B),(E). Accordingly, the judgment is affirmed.
NOTES
[1] Plaintiff contends the verdict sheet was prepared by defendants. There is reference at the charge conference to defendants' submission, but plaintiff also noted a lack of objection or reference to his own e-mail submissions. Most of the charge conference was off the record, but the trial judge gave both parties the opportunity to comment at length with respect to both the charge and verdict sheets before they were presented to the jury. There was no relevant objection to either.
[2] Much of the evidence deals with the harassment claim that was "no caused" by the jury and which is not the subject of a cross-appeal. The evidence of harassment is relevant only as background for the commencement of plaintiff's suit which gives rise to the alleged retaliatory discharge, and we find no need to detail it at length. The absence of sufficient evidence of harassment, or of Tropicana's upper management's failure to enforce the anti-harassment policy, does not affect the issue of whether plaintiff was wrongfully terminated because of his suit over his perception of harassment and the company's failure to take appropriate action.
[3] During the charge conference, the trial judge indicated that because Montalto's role was "at best administerial in the sense that the testimony was that he did not prepare the letter terminating Mr. Kluczyk, he was not involved in the decision terminating Mr. Kluczyk" and that "there was no rational basis for the jury to find liability other than as an aider and abettor," which was a theory of one count of the complaint and presented to the jury with respect to the sexually hostile work environment claim, the judge ultimately charged that if the jurors found "plaintiff's termination was retaliatory then you must consider whether Mr. Montalto is individually liable on this claim."
[4] The jury was told there were four elements to the retaliatory discharge and that the first three were satisfied. The parties disagree as to whether there was sufficient evidence of causation. The jury was told that "to prove this retaliation claim plaintiff must prove by a preponderance of the evidence that there is a causal link between these complaints of sexual harassment and the defendant's decision to fire him."
[5] At one point the judge also included attorney Chiaravalloti (although the name was misspelled, we believe it was he to whom the judge referred), but his name was not included when the judge subsequently named only Montalto, Freda and two other individual defendants in stating that "[t]o find that upper management actually participated in wrongful conduct you must find that upper management employees not only knew about the wrongful conduct but also engaged in affirmative acts to accomplish the wrongful conduct." The judge then added "[t]his factor would be satisfied ... if you find either of the individual defendants Steve Montalto, Patricia Freda, Frank Zeleznick or Anthony Valiente, is a member of upper management or if you find that a member of upper management affirmatively assisted or otherwise participated directly in the wrongdoing."
[6] There was a lengthy charge conference, and defendants' "only objection" was to a portion which defendants claimed improperly applied Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 626 A.2d 445 (1993), to a "same sex case." The objection did not relate to the retaliation claim.
[7] While the constructive discharge claim was not pursued at trial, plaintiff's attorney reasonably noted in defending his fee application, that "the discovery during this pre-termination period of the case directly dealt with the very reasons asserted by defendants for plaintiff's termination." Moreover, while defendants claim plaintiff did not prevail against them, he prevailed against Tropicana and two members of "upper management," and all defendants were represented by the same counsel.