NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3068-16T2

LISA BALDUCCI,

    Plaintiff-Respondent,

v.

BRIAN M. CIGE,

    Defendant-Appellant.

_____

<table>
<tr><td>APPROVED FOR PUBLICATION<br><br>August 30, 2018<br><br>APPELLATE DIVISION</td></tr>
</table>

Submitted February 7, 2018 — Decided August 30, 2018

Before Judges Alvarez, Nugent and Geiger.

On appeal from Superior Court of New Jersey, Law Division, Somerset County, Docket No. L-1004-16.

Brian M. Cige, appellant pro se.

Nagel Rice, LLP, attorneys for respondent (Jay J. Rice, of counsel and on the brief; Michael J. Paragano, on the brief).

The opinion of the court was delivered by

NUGENT, J.A.D.

Defendant, Brian M. Cige, an attorney, appeals from two Law Division orders. The orders declared unenforceable and void his retainer agreement (the "Agreement") with plaintiff, Lisa Balducci, a client he represented in a claim seeking damages under the New Jersey Law Against Discrimination ("LAD"), N.J.S.A. 10:5-

1 to -49.[1]  The orders also dismissed his counterclaim for fees and costs.  The trial court permitted defendant to recover for his services based on the doctrine of quantum meruit.

The trial court found defendant violated his professional responsibility to explain the Agreement's material terms to plaintiff so that she could make an informed decision about retaining him.  The trial court's factual and credibility findings have ample support on the plenary hearing record.  Defendant did not explain the effect his "greater three fee agreement" would have on any recovery, inform plaintiff of alternatives to such an agreement, or give plaintiff any indication of the tens of thousands of dollars in expenses she would have to pay as the case progressed.  Hence we affirm.

## I.

## A.

This action's procedural history began in July 2016 when plaintiff filed a declaratory judgment action seeking to have the trial court declare the Agreement unenforceable.  Plaintiff had retained defendant to represent her and her child in a LAD action.  She later terminated his representation and retained new counsel.

---

[1]  Plaintiff acted in a representative capacity, seeking LAD remedies on behalf of her child, who was not yet an adult when defendant filed the underlying LAD complaint.

After plaintiff terminated defendant's services, he billed her for $286,746.67 in fees and expenses. Defendant's lien against any recovery impeded meaningful settlement negotiations, so plaintiff filed the declaratory judgment action.

Defendant filed an answer. He also filed a counterclaim seeking a judgment for fees and costs.[2] Following a plenary hearing, the trial court declared the fee agreement unenforceable. This appeal followed.

### B.

The parties developed the following record at the plenary hearing. Plaintiff and defendant were friends when she and her child met him at his office in September 2012 to discuss a possible lawsuit seeking remedies under the LAD.[3] During the meeting, defendant presented plaintiff with the Agreement. The Agreement included these terms:

> 3. Legal Fees. The Law Firm cannot predict or guarantee what your final bill will be. This will depend on the amount of time spent on your case and the amount of other expenses.

---

[2] A fee arbitration committee had exercised its discretion and declined to arbitrate the fee dispute because the total fee at issue exceeded $100,000. R. 1:20A-3(b)(3).

[3] The complaint in the underlying action is not included in the appellate record. During defendant's opening statement at the plenary hearing and again during his testimony, defendant said "from day one" the underlying action "had always been a LAD case."

A-3068-16T2

A. Initial Payment. The Law Firm will begin work on your case upon <u>receipt</u> of $3750.00. This sum will be used to pay for your initial filing fee, other fees and expenses, and legal fees, according to this Agreement.

B. Retainer. You agree to pay $7500.00* as the minimum retainer, but maximum amount for legal fees to be paid <u>until</u> the case is settled or judgment is entered. Notwithstanding, you are encouraged to make additional payments toward legal fees as invoiced to minimize having a large invoice when the case ends.

*$3750.00 to be paid within ninety (90) days of signing this agreement.

C. Legal Fee. You agree to pay the Law Firm for legal services the <u>greater</u> of:

i. <u>Rate Per Hour</u>    <u>Services of</u>

$475.00         Brian M. Cige, Esq.

(This hourly rates [sic] is subject to review and revision 11 January 2014 and annually thereafter. Further, at the Law Firm's discretion, it may either use the rates which were current when the services were performed and adding interest at the regular rate for paying clients or using the rate current at the time payment is made.)

ii. thirty seven and one half percent (37 1/2%) of the net recovery (including attorneys fees referred to in iii below).

4                                    A-3068-16T2

iii. statutory attorneys fees, by settlement or award, received with credit for all payments received.

Client has been advised that, in employment cases, the employer may offer reinstatement of his or her prior position or a comparable position. In the event the client accepts an offer of reinstatements, the client agrees to pay the Law Firm fifteen additional percent (15%) of the total pay he or she would receive from the employer upon reinstatement for a one (1) year pay period, in no more than six (6) equal monthly installments.

D. All Services Will Be Billed. You will be billed at the hourly rate set forth in paragraph 3C for all services rendered. This includes telephone calls (minimum charge of [six] minutes), dictating and reviewing letters, travel time to and from meetings and the Court, legal research, negotiations and any other services relating to this matter. Client hereby gives the Law Firm a continuing lien on the client's claim and the proceeds thereof for the amount of the attorney's fees, out-of-pocket expenses, and costs for which the client is obligated under this agreement. The attorney's lien is given by the client pursuant to New Jersey State [sic] Annotated Title 2A:13-5.

4. Costs and Expenses. In addition to legal fees, you must pay the following costs and expenses: experts' fees, court costs, accountants' fees, appraisers' fees, service fees, investigators' fees, deposition costs, messenger services, photocopying charges, telephone toll calls, postage and any other

necessary expenses in this matter. The Law Firm may require that expert(s) be retained directly by you. You would then be solely responsible to pay the expert(s).

5. Bills. The Law Firm will send you itemized bills from time to time. The Law Firm may require that costs and expenses (see paragraph 4) be paid in advance. All bills for costs and legal expenses are due upon receipt and failure to pay will waive any discounts. You will be charged interest at a monthly rate of one and one-half percent ($1\frac{1}{2}$%) on any remaining balance not paid within thirty (30) days from the date of the bill. If an outstanding balance necessitates collection efforts by the Law Firm will be paid its legal fees for collecting same. Further, at the Law Firm's discretion, it may either use the rates which were current when the services were performed and adding interest at the regular rate for paying clients or using the rate current at the time payment is made.

The parties disputed the circumstances under which plaintiff signed the Agreement. According to plaintiff, defendant did not explain the terms of the Agreement. Rather, he told her, "[t]his is a standard agreement for a case like [this]." Plaintiff, who had worked for attorneys and who now operated her own business, "quickly glanced at it and . . . had a concern." She said to defendant, "Brian, this says that I am going to be responsible at the end if we lose the case." He said she would not. He told her the language concerning his hourly rate was standard for a LAD case like this. He said: "We are friends. I was at your wedding.

6

I would never do this to you. Ignore that. Don't worry about it. It is standard information." Plaintiff signed it, because she trusted him, he was a friend, and she believed him.

In contrast, defendant testified, "plaintiff was provided this. Read it. Understood it. And signed it." Defendant emphasized the "Signatures" paragraph of the agreement, located immediately above the signature lines, stated: "You and the Law Firm have read and agree to this Agreement. The Law Firm has answered all of your questions and fully explained this Agreement to your complete satisfaction. You have been given a copy of this Agreement." Defendant denied telling plaintiff he would not enforce the Agreement's hourly rate provision. He testified, "I provided her with the retainer agreement in my office. I asked her if she had any questions after she reviewed it. And she signed it. And we were on our way."

Plaintiff's child testified and corroborated plaintiff's testimony. The child said defendant told plaintiff not to worry about legal fees if the case was lost. The child was emphatic defendant said he would never do that to plaintiff because they were friends.

Plaintiff testified that after retaining defendant, she began receiving monthly bills for defendant's services. Extremely upset, she telephoned defendant and asked the meaning of the bills.

He said: "Lisa, I have to by law keep track of the billing, . . . but I know they look a lot, . . . but I am padding them.  So at the end of the day when they are found guilty of L-A-D at the very least, then the [defendants'] attorneys will have to pay for it and you will not have to have those fees."  Plaintiff said defendant agreed to stop sending the bills because he realized how much they upset her.

Defendant acknowledged plaintiff became upset when she received bills based on his hourly fee, so he stopped sending them.  He denied he stopped sending them for the reason given by plaintiff.  He claimed he had agreed she could defer payment.

The fee agreement is dated September 7, 2012.  Plaintiff terminated defendant's services in September or October 2015.  The parties' attorney-client relationship had begun to sour ten months earlier, in January 2015.

The problems developed, according to plaintiff, when depositions began in the underlying case.  Plaintiff testified she was exhausted but was nonetheless doing much of the work to prepare for depositions while defendant was away at chess tournaments.  To review material in preparation for depositions, plaintiff and her child went to defendant's office.  Plaintiff said defendant required her to "pay his paralegal in which to keep the office open so both my [child] and I could work and prepare for

depositions." Plaintiff authenticated a check for $100 she paid to defendant's paralegal.[4]

In March 2015, in an exchange of e-mails, plaintiff asked defendant to "please confirm what [sic] the agreement to handle [the] case we signed was for 1/3 (30%)?" Defendant replied by sending an e-mail stating, "[p]lease see attached. Not [thirty percent] as you thought, [thirty-seven and one-half percent]." Defendant attached an electronic copy of the fee agreement. Plaintiff testified defendant's e-mail did not mention the hourly rate, which she assumed was because he had previously told her to ignore that part of the fee agreement.

During the last week of April 2015, the parties again exchanged e-mails. On April 23, plaintiff wrote:

> Brian, I understand you wish to avoid this topic however, I have endlessly been asking - how much are the experts FEES and I am unable to come up with $50,000 - $100,000 in expert fees so I have a large firm willing to absorb those fees if necessary — when we last met you said your billing was around $100,000 or $120,000 I told other firm same and deps were almost done as we are waiting

---

[4] The appellate record contains a copy of the check with a notation below it that defendant and his paralegal "said no more in checks only cash so no paper trail — it would complicate billing?" Plaintiff testified to this and said she "did a second check." Defendant objected to the testimony as hearsay and the judge struck it. For this reason, we disregard both the testimony about the second check and the notation concerning it in the appellate record.

> judges decision.  We need to discuss this because this case is moving forward quickly.

In September or October 2015, plaintiff terminated her attorney-client relationship with defendant.  She had repeatedly voiced to defendant she was unhappy with his lack of preparation for depositions.  Documents were missing, and defendant kept insisting she be patient because his paralegal was ill and having memory issues.  Plaintiff noted one instance in which depositions had to be stopped while she went to defendant's office to try to find certain discovery.  She was also unhappy that he had attended chess tournaments and left her to prepare for depositions in his office without his assistance.

In addition, defendant sent plaintiff an invoice dated September 2, 2016, for $12,400.61 in disbursements.  Within approximately a month of receiving the invoice, plaintiff terminated the attorney-client relationship.  Nearly four months later, on January 29, 2016, defendant invoiced plaintiff $15,955.45 for expenses.

Defendant had not specified in the Agreement amounts he would charge plaintiff for routine expenses.  His invoice included twenty-five cents per page for photocopying, one dollar for every e-mail defendant sent or received, one dollar for every facsimile, and fifty-five cents per mile for travel.  The invoice included

10

$1700 for e-mails. Defendant also admitted that in addition to charging plaintiff for every e-mail he sent or received, he charged for his time.

After plaintiff communicated to defendant that she was terminating his services, defendant told plaintiff she had to pay him approximately $250,000 based on his hourly rate for the services he had rendered. Plaintiff was emphatic that she would never have signed the Agreement, and she would have gone to another firm, had she known defendant would hold her responsible for his hourly rate.

Defendant disputed much of plaintiff's testimony. He first testified about his background. He testified his experience included more than twenty-five years of litigating LAD cases. He also had lectured on LAD claims for the Institute of Continuing Legal Education. He had little experience, however, litigating the type of claim for which plaintiff retained him. In fact, he had never tried such a case. He was not a certified civil trial attorney, Rule 1:39, and had tried only ten or twelve jury trials during his thirty-three years practicing law.

Defendant insisted plaintiff clearly understood the "hourly" component of the fee agreement. Otherwise, he would not have sent her bills on a regular basis. He asserted, "if plaintiff did not understand . . . she had an obligation to pay the hourly rate

billed, then it makes no sense that she would have been upset when she got the hourly billing, because she would have had no obligation." Defendant claimed his hourly rate did not become an issue until plaintiff switched attorneys.

Defendant's perspective was the attorney-client relationship began to sour when plaintiff had to pay deposition costs. She also complained about the ongoing expenses, for which she was responsible, as clearly stated in the Agreement. He explained that he used an outside source for photocopying and merely passed on the expenses. He had nothing to do with what she was charged. In fact, based on plaintiff's complaints about the photocopying charges, he negotiated a reduction with the provider.

Defendant also claimed plaintiff randomly expressed concerns that he was not being taken seriously because he was a solo practitioner. She commented she would do better with a big firm. Defendant surmised what brought the relationship "to a head" was a conversation concerning the value of the case. He communicated an opinion about the value of the case — based on his discussion with another practitioner — and she became very upset because she thought it was worth millions of dollars. He denied he had charged plaintiff for keeping his office open at night.

During cross-examination, defendant admitted he did not tell plaintiff he had never tried the type of case he would be handling

12

for her. Nor did defendant project for plaintiff what her anticipated fees would be based on his hourly rate and the time it would take to complete the case. Although he admitted billing over $250,000 for the time he expended in the underlying case, he did not tell plaintiff he knew, from experience, his hourly billings could exceed $100,000 if the case was not resolved before trial. Nor did he explain that his fee for handling the case, billed at his hourly rate, could exceed the amount of a settlement or a jury verdict.

C.

In its written opinion, the trial court found "that a reasonable client would have understood [d]efendant's retainer agreement to establish a payment structure much like most other contingent fee agreements — that [p]laintiff would only be obligated to pay if she was successful on her suit." The court found defendant was obligated by the Rules of Professional Conduct (RPCs) "to communicate clearly that his fee structure was different, and [p]laintiff would be obligated to pay regardless of the success of her case, so that [p]laintiff could make an informed decision as to whether she was willing to accept such an agreement." Resolving credibility issues in favor of plaintiff, the court found that no such discussion took place. The court added, however, that notwithstanding the credibility issues, "it

13

is clear [d]efendant breached his duty to ensure [p]laintiff was adequately informed regarding the terms of the fees [d]efendant would be entitled to."

The court also found defendant violated his duty under the RPCs "by failing to articulate how expensive [p]laintiff's matter could ultimately be, and what recovery [p]laintiff could expect (within reason)." The court determined such information was "clearly material and necessary to permit [p]laintiff to make an informed decision regarding representation." In so finding, the court noted defendant did not counsel plaintiff as to what a reasonable settlement offer would be but instead communicated to the adversaries plaintiff's uneducated settlement demand of $3,500,000.

The trial court also took issue with the costs defendant charged plaintiff, noting the fee agreement "clearly failed to identify numerous costs [d]efendant would ultimately liberally charge [p]laintiff with, including, most egregiously, $1 per e-mail sent and received."

The trial court found credible plaintiff's testimony that had she known she would be charged an hourly rate even in the event her claims were unsuccessful, she would never have agreed to defendant representing her. Considering the nature of plaintiff's claims, evidence her new attorney presented concerning awards

14                                                    A-3068-16T2

received by similarly situated plaintiffs, and defendant's lien, the court expressed its inclination to "credit all testimony positing that [p]laintiff was misled by [d]efendant throughout the course of his representation of her."[5]

For the reasons expressed in its opinion, the court entered an order declaring the retainer agreement unenforceable and void.

## II.

On appeal, defendant argues the retainer agreement is enforceable because it is in writing and signed by the parties. He asserts he complied with the RPCs by discussing and explaining to plaintiff her obligations under the agreement. Defendant contends the trial court committed reversible error by holding a plenary hearing without affording the parties an opportunity for discovery. He also contends the court committed trial errors by failing to address the parol evidence rule and by failing to grant a directed verdict on his counterclaim.

In addition to his allegations of error, defendant asserts the trial court's procedural and evidentiary rulings and decision voiding the retainer agreement were motivated by the court's desire to facilitate a settlement of the underlying claim. For that

---

[5]  The attorneys who represented plaintiff in her fee dispute with defendant were not the same attorneys who represented her in the LAD action after she discharged defendant.

reason, defendant requests the court be disqualified in the event of a remand.

Plaintiff responds the record supports the trial court's findings as well as its credibility determinations. Plaintiff contends discovery was unnecessary. She points out defendant did not object to the plenary hearing when it was scheduled. Plaintiff adds that nothing in the record supports defendant's claim that the trial court was biased, so there is no basis for disqualifying the court if the matter is remanded.

Defendant replies for the most part by reiterating and emphasizing the points he raised in his original brief.

III.

Our review of "[f]inal determinations made by the trial court sitting in a non-jury case . . . [is] limited and well-established." Seidman v. Clifton Sav. Bank, 205 N.J. 150, 169 (2011). The court's findings of fact are "binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998) (citation omitted). "[W]e do not disturb the factual findings and legal conclusions of the trial [court] unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." In re Forfeiture of Pers. Weapons & Firearms

Identification Card Belonging to F.M., 225 N.J. 487, 506 (2016)

(quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474,

484 (1974)).

The hearing record in the case before us includes adequate, substantial, credible evidence supporting the court's decision. Plaintiff testified defendant did not explain the terms of the Agreement to her. Defendant admitted he did not explain to plaintiff that the cost of his services, based on his hourly rate and liberal billing practices, could approach or exceed plaintiff's recovery. More important, plaintiff testified defendant represented — or misrepresented as the case may be — that he would not charge her his hourly rate. Plaintiff's child also testified defendant made the representation. The testimony of these witnesses amply supports the trial court's findings.

Plaintiff's testimony, the testimony of her child, and the documentary evidence readily dispel any notion the trial court's findings and legal conclusions are so manifestly unsupported by or inconsistent with the competent, relevant, reasonably credible evidence as to offend the interest of justice. Rova Farms, 65 N.J. at 484. That alone is ample reason to affirm the order nullifying the Agreement. But because the Agreement is ambiguous if not misleading, particularly in the context of a fee-shifting claim, we address the trial court's opinion that defendant breached

his ethical obligations to fully inform plaintiff of the Agreement's ramifications.

IV.

A.

The Agreement in this case concerns a statutory fee-shifting claim. Because defendant's ethical obligations to the client arose — and thus must be understood — in that context, we briefly review the policies underlying the LAD.

The "LAD is remedial social legislation whose overreaching goal is to eradicate the 'cancer of discrimination.'" Nini v. Mercer Cty. Cmty. Coll., 202 N.J. 98, 108-09 (2010) (quoting Fuchilla v. Layman, 109 N.J. 319, 334 (1988)). "Underlying the LAD's expansive language advocating the elimination of discrimination is also the directive that we compensate victims for economic and noneconomic injuries attributable to . . . discriminatory conduct." Tarr v. Ciasulli, 181 N.J. 70, 80 (2004). The Legislature has recognized a discrimination victim's hardships:

> The Legislature further finds that because of discrimination, people suffer personal hardships, and the State suffers a grievous harm. The personal hardships include: economic loss; time loss; physical and emotional stress; and in some cases severe emotional trauma, illness, homelessness or other irreparable harm resulting from the strain of employment controversies;

A-3068-16T2

relocation, search and moving difficulties; anxiety caused by lack of information, uncertainty, and resultant planning difficulty; career, education, family and social disruption; and adjustment problems, which particularly impact on those protected by this [A]ct. Such harms have, under the common law, given rise to legal remedies, including compensatory and punitive damages. The Legislature intends that such damages be available to all persons protected by this [A]ct and that this [A]ct shall be liberally construed in combination with other protections available under the laws of this State.

[N.J.S.A. 10:5-3 (emphasis added).]

The LAD fee-shifting provision, N.J.S.A. 10:5-27.1, entitles a plaintiff to an award of attorneys' fees if the plaintiff has been "awarded some affirmative relief by way of an enforceable judgment against defendant or other comparable relief through a settlement or consent decree." Tarr, 181 N.J. at 86-87.

The Supreme Court has determined what constitutes a "'reasonable attorney's fee,' payable under fee-shifting statutes such as the LAD." Rendine v. Pantzer, 141 N.J. 292, 316 (1995). A trial court considering a reasonable fee must "determine the 'lodestar': the number of hours reasonably expended multiplied by a reasonable hourly rate." Id. at 334-35. The trial court should exclude hours not reasonably expended. Id. at 335. In determining whether an attorney's hourly rate is reasonable, "the court should assess the experience and skill of the prevailing party's attorneys

and compare their rates to the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." Id. at 337 (quoting Rode v. Dellarciprete, 892 F.2d 1177, 1183 (3d Cir. 1990)).

After determining the lodestar, a trial court "should consider whether to increase that fee to reflect the risk of non-payment in all cases in which the attorney's compensation entirely or substantially is contingent on a successful outcome." Ibid. The Supreme Court has "conclude[d] that contingency enhancements in fee-shifting cases ordinarily should range between five and fifty-percent of the lodestar fee, with the enhancement in typical contingency cases ranging between twenty and thirty-five percent of the lodestar." Id. at 343.

Statutory fee-shifting provisions and awards are "'designed to attract competent counsel' to advance the public interest through private enforcement of statutory rights that the government alone cannot enforce." Pinto v. Spectrum Chem. & Lab. Prods., 200 N.J. 580, 593 (2010) (quoting Coleman v. Fiore Bros., 113 N.J. 594, 598 (1989)). They also advance the policy that damages be available to all persons protected by the LAD. A court's award of fees under the LAD's fee-shifting provision does not diminish LAD damages available to a plaintiff, because the defendants must pay the statutory fee award.

In contrast, in the absence of a statutory fee award, an attorney's hourly fee can approach or exceed a LAD client's recovery for economic and non-economic loss caused by discrimination. Such an hourly fee arrangement undermines both the LAD policy of compensating victims of discrimination and the policy of attracting competent counsel to advance the public interest through private enforcement of statutory rights while bearing the risk of nonpayment in the event of an unsuccessful outcome. What's more, such a fee arrangement can be financially devastating to a client.

There is no dearth of competent, civic-minded attorneys willing to litigate LAD and other statutory fee-shifting cases under fee agreements that do not include an hourly component. The number of such cases litigated in our trial courts and reported in the case law evidence this, as does — at least as to numbers — advertising on television and radio, in telephone books and newspapers, and on billboards and other media. Indeed, the firm currently representing plaintiff in the LAD action has a fee agreement without an hourly component.

Ethically then, must an attorney whose fee for undertaking a LAD case that includes an hourly rate component explain both the consequences on a recovery and the availability of other competent counsel likely willing to undertake the same representation based

on a fee without an hourly component?  We conclude the answer is yes.

B.

In a LAD case, as in any case, "[a] lawyer's fee shall be reasonable."  RPC 1.5(a).  Fee agreements in LAD cases are subject to the same ethical considerations as all contracts between lawyers and clients.  In view of "the unique and special relationship between an attorney and a client, ordinary contract principles governing agreements between parties must give way to the higher ethical and professional standards enunciated by our Supreme Court."  Cohen v. Radio-Electronics Officers Union, 275 N.J. Super. 241, 259 (App. Div. 1994), modified on other grounds, 146 N.J. 140 (1996).  For that reason, a "contract for legal services is not like other contracts."  Ibid.

The Rules of Professional Conduct require that "[w]hen the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated in writing to the client before or within a reasonable time after commencing the representation." RPC 1.5(b).  Contingent fee agreements:

> [S]hall be in writing and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial, or appeal, litigation and other expenses to be deducted from the recovery, and whether such expenses are to be

22

> deducted before or after the contingent fee
> is calculated.
>
> [RPC 1.5(c).]

Equally important, "[a] lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." RPC 1.4(c).

Maximizing fees charged to clients should not be an attorney's primary aim. As a scholar on legal ethics once wrote:

> After an educational process emphasizing the importance of preparation and indeterminacy of outcomes, most lawyers will prefer to leave no stone unturned, provided, of course, they can charge by the stone. For an attorney anxious to avoid overlooking details and underbilling hours, more is always better. For the client and the courts, the calculus may be otherwise.
>
> [Deborah L. Rhode, Ethical Perspectives on Legal Practice, 37 Stan. L. Rev. 589, 635 (1985).]

"An '[a]ttorney[] must never lose sight of the fact that the profession is a branch of the administration of justice and not a mere money-getting trade.'" Alpert, Goldberg, Butler, Norton & Weiss, PC v. Quinn, 410 N.J. Super. 510, 529 (App. Div. 2009) (alterations in original) (quoting Kriegsman v. Kriegsman, 150 N.J. Super. 474, 480 (App. Div. 1997)).

For the foregoing reasons, an "attorney's freedom to contract with a client is subject to the constraints of ethical

considerations and [the Supreme Court's] supervision." Id. at 529-30 (alteration in original) (quoting Cohen, 146 N.J. at 155). "An agreement that violates the ethical rules governing the attorney-client relationship may be declared unenforceable." Id. at 530 (quoting Tax Auth. v. Jackson Hewitt, 187 N.J. 4, 15 (2006)).

The application of these principles to the facts of this case leads to a single conclusion: the trial court properly found the Agreement was unenforceable and void.

### C.

The Agreement in this case — requiring the client to pay the greater of defendant's hourly rate ("the hourly provision"), thirty-seven and one-half of the net recovery including statutory attorneys' fees (the "contingent fee provision"), or statutory attorneys' fees (the "statutory fee provision") — is problematic if not misleading. The statutory fee provision may be the only one of the three in which plaintiff receives full compensation, because the statutory fee is payable by the defendants in the underlying case. Yet, the likelihood of it materializing is largely illusory.

This is so, because the Supreme Court has directed that a trial court consider a fee enhancement to the lodestar "to reflect the risk of nonpayment in all cases in which the attorney's

compensation entirely or substantially is contingent on a successful outcome." Rendine, 141 N.J. at 337. The standards the Court adopted in Rendine "serve as limits on the amount of contingency enhancements and . . . require a relationship between the amount of the enhancement awarded and the extent of the risk of nonpayment assumed by counsel for the prevailing party." Id. at 339. Here, defendant bore no risk of nonpayment. If he and plaintiff recovered nothing, he was nonetheless entitled under the Agreement to have plaintiff pay the full value of his services. In such situations, where an attorney assumes no risk, a trial court following Rendine would presumably award no fee enhancement. Thus, at most, the statutory fee provision would be no greater than the Agreement's hourly fee provision.

In the case before us, the statutory fee would likely be less, in view of plaintiff's testimony that defendant said he was padding his bills and in view of questionable billing practices cited by the trial court or exposed during cross-examination of defendant.[6] Thus, the statutory fee provision — likely the only

---

[6] Our comments should not be construed as suggesting our view either that the hourly rate in this case was or was not excessive for an attorney who had never tried the specific type of claim, was not certified by the Supreme Court as a civil trial attorney, and only tried cases once every two or three years. That issue was not before the trial court and there was no evidence presented concerning it.

A-3068-16T2

one that would potentially have allowed plaintiff to retain full compensation for her damages - was unlikely to materialize.

The Agreement's contingent fee provision is also problematic to the extent it is computed on both plaintiff's damages and the statutory fee award and can result in a fee that exceeds both — at the expense of what the client receives. Certainly, an attorney is entitled to receive the higher of the two, even if a reasonable, conscionable, contingent fee applied to a large damage award results in a fee far exceeding a statutory fee award. Lawyers who bear a risk of loss and obtain such results deserve to be compensated accordingly. And though a contingent fee reduces a LAD plaintiff's damages, the balancing of competing policies compels the result.

The question, though, is why in view of the LAD's underlying policies should counsel receive in excess of the greater of a conscionable contingent fee computed on a damage award, or a statutory fee award — reasonable by virtue of judicial determination — if the excess diminishes the client's compensation for damages. Counsel may argue that because a statutory fee award is part of the client's recovery obtained through the attorney's efforts, the attorney should be entitled to a contingent percentage

of the fee award.[7]  But an attorney's hourly rate for pursuing the statutory fee award is included in the award itself — an award, again, that has been determined by the court to be reasonable.  So if the attorney's work in obtaining the statutory fee award is reflected in the award — an award adjudicated as reasonable — and the attorney is receiving more based on a contingent fee, why should a plaintiff's damage award be reduced even more?  The issue is further complicated, in most cases, by the absence of an advocate to advance the point on behalf of a client, perhaps an uninformed client.[8]

We do not find the Agreement in this case unenforceable because of the problematic nature of the three fee provisions.  We do find the Agreement unenforceable because, as the trial court found, defendant did not adequately inform plaintiff about the ramifications.

---

[7]  See A.W. v. Mount Holly Twp. Bd. of Educ. (In re Costello & Mains, LLC), 453 N.J. Super. 110, 114 (App. Div. 2018).

[8]  These issues are recurring.  See A.W., 453 N.J. Super. at 113-114 (involving a fee agreement requiring the client to pay the greater of forty-five percent - an arguably excessive and unconscionable contingent fee — of the net recovery, including negotiated or statutory legal fees, or the firm's hourly rate).  We are also aware of attorneys seeking payment of a substantial contingent fee plus a statutory fee award.  One such case has been decided within the past month.  The Civil Practice Committee or some other appropriate Supreme Court Committee should perhaps address these issues.

Based on defendant's experience, he certainly understood his hourly fee could approach or exceed a settlement offer, perhaps even plaintiff's recovery, if the case resolved shortly before or at a trial. If defendant did not know that from his experience with LAD cases, he should have known it from case law. During the twenty-three years that have passed since the Court decided Rendine, it has become evident that an attorney's hourly fee for a LAD case can approach or exceed a plaintiff's recovery. See e.g., Szczepanski v. Newcomb Med. Ctr., 141 N.J. 346, 352-53 (1995) (addressing plaintiff's statutory fee application for lodestar of $135,360 based on $200 per hour rate after judgment on jury verdict of $115,441, including prejudgment interest); Kluczyuk v. Tropicana Products, Inc., 368 N.J. Super. 479, 484 (App. Div. 2004) (affirming award to plaintiff's counsel of $315,547.45 combined lodestar and enhancement on jury award of $454,315); Gallo v. Salesian Soc'y, 290 N.J. Super. 616, 622 (App. Div. 1996) (affirming trial court's reduced award to plaintiff's counsel of $48,750, from fee request exceeding $100,000 for more than 400 hours of work, following jury verdict in plaintiff's favor in the amount of $24,000); Davis v. Husain, No. A-2691-11 (App. Div. Mar. 13, 2013) (slip op. at 6, 26-27) (affirming trial court's lodestar computation of $68,095 but reversing the trial court's denial of fee enhancement on jury's damage verdict of $12,500); Heusser v.

28

N.J. Highway Auth., No. A-0622-05 (App. Div. Mar. 20, 2008) (slip op. at 52-53) (awarding lodestar of $312,659.15 to counsel who obtained a $97,198 award).[9]

In view of the depleting effect a large hourly fee can have on a plaintiff's recovery in a LAD action, in order to make an informed decision about whether to retain counsel, a client should understand that other competent counsel may accept the case solely on a contingent fee basis. Given the choice, a plaintiff might reject a retainer agreement — as plaintiff here would have done — that contains an hourly component. Regardless, a potential client should be given that information in order to make a knowing and intelligent decision when selecting counsel. An attorney thus has an ethical obligation to so inform a client.

In addition, an attorney is ethically obligated to provide information about litigation costs a client must advance. A client — such as plaintiff here — should understand she will be expected to "front" thousands of dollars, perhaps, as here, tens of thousands of dollars, depending on such things as the number of

---

[9] The unreported opinions are not cited as precedent, Rule 1:36-3, but solely for the limited purpose of presenting relevant but general background and history. See Pressler & Verneiro, Current N.J. Court Rules, cmt. 2 on R. 1:36-3 (2018); State v. Western World, Inc., 440 N.J. Super. 175, 179 n.1 (App. Div. 2015); Badiali v. N.J. Mfrs. Inc. Grp., 429 N.J. Super. 121, 126 n.4 (App. Div. 2012), aff'd, 220 N.J. 544 (2015).

depositions to be taken and whether experts are retained; whereas other competent counsel may advance costs.

In summary, we conclude that if an attorney's fee in a LAD or statutory fee-shifting case is based in whole or in part on an hourly rate, then the attorney is ethically obligated to inform the client of the ramifications. The attorney must inform the client that if the case becomes complex and protracted, the hourly rate-based fee the client is responsible to pay can approach or even exceed his or her recovery. Further, the attorney must inform the client other competent counsel represent clients in similar cases solely on a contingent fee basis, without an hourly component, and might also advance costs. The attorney should provide examples of how much hourly fees have totaled in similar cases, or if the attorney has no such experience with similar cases — in which case consideration should be given to referring the case to a certified civil trial attorney — how much hourly fees have totaled in the same types of cases found in case law.

Similarly, if the client is required to advance costs, the attorney must provide the client with approximate costs resulting from things such as depositions and expert fees, and must give examples of such costs in similar cases. The attorney must disclose that other competent counsel who represent clients in similar cases advance litigation costs.

We understand no two cases are the same, and fees and costs are not predictable with precision. But counsel charging high hourly rates as part of fee agreements in fee-shifting cases are presumably doing so based on their experience in handling such cases — as defendant proclaimed here. Surely, such experienced counsel are able to estimate the time and expenses to litigate such claims through certain phases and to estimate the cost of events such as depositions and the fees of experts.

The Agreement in this case has other flaws. Nearly nine years ago, we emphasized that "[f]ull and complete disclosure of all charges which may be imposed on the client is also necessitated by RPC 1.4(c)." Alpert, 410 N.J. Super. at 531. The reason is clear: "[i]f the client does not know what charges and costs beyond the hourly rate he may be exposed to, how can the client be expected to make an informed decision regarding representation." Ibid. Here, defendant did not make full and complete disclosure of costs he intended to pass on to the client, including his "egregious" charges for e-mails. We also find questionable the Agreement's additional fee of fifteen percent of one year's wages in the event a client who has lost a job based on discrimination is reinstated.

For all the foregoing reasons, we find no error in the trial court's decision.

V.

The fee agreement in this case is ambiguous and to some extent illusory. Defendant failed to discharge his ethical obligation to explain the terms of the agreement, their implications, and alternatives to the agreement, so the client could make an informed decision regarding his representation. The trial court did not err by so finding.

Defendant's remaining arguments are without sufficient merit to warrant further discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

32                                                              A-3068-16T2