SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

## Lisa Balducci v. Brian M. Cige (A-54-18) (081877)

**Argued October 24, 2019 -- Decided January 29, 2020**

**ALBIN, J., writing for the Court.**

Plaintiff Lisa Balducci instituted a declaratory-judgment action to invalidate the retainer agreement into which she entered with her former attorney, defendant Brian Cige, on the ground that Cige procured the agreement in violation of the Rules of Professional Conduct. A Superior Court judge voided the agreement, and the Appellate Division affirmed. But the Appellate Division also made a number of pronouncements about ethical obligations on attorneys handling fee-shifting claims. The Court considers Cige's challenge to the judgment against him, as well as arguments that the professional obligations imposed by the Appellate Division are at odds with current practices and are not mandated by the Rules of Professional Conduct.

Balducci retained Cige to represent her son in a bullying lawsuit, brought under New Jersey's Law Against Discrimination (LAD), against a school district. Three years later, she terminated Cige's representation and retained another lawyer to handle the case. Balducci filed a declaratory-judgment action to void the retainer agreement, and a Superior Court judge conducted a hearing at which Balducci, her son, and Cige testified.

Balducci testified that, in September 2012, she approached Cige about bullying that her son had encountered in school. Cige presented her with what he described as a standard retainer agreement for a LAD case, and Balducci raised questions about language that seemingly made her the guarantor of all legal fees and costs, even if the lawsuit failed. Cige told her not to be alarmed by the "standard language" and assured her that the attorney's fees would be paid by the school board, not by her. (That account was corroborated by Balducci's son, who testified that he was present during the meeting.) Trusting Cige, Balducci signed the agreement, one key provision of which required her to "pay the Law Firm for legal services the greater of" Cige's hourly rate, 37 1/2% of both the net recovery and any statutory fee award, or statutory attorney's fees. By early 2015, Balducci became dissatisfied with Cige's handling of the case. The school board rejected her first settlement demand of $3,500,000. After consulting with an expert in bullying cases, Cige approximated the value of the case at somewhere between $500,000 and $700,000. Only when Balducci terminated his services did he inform her she was responsible for the payment of his hourly fees -- almost $271,000.

1

Cige gave a very different account, but admitted that he did not inform Balducci of the potential value of the case, of the potential litigation expenses, or of the estimated financial obligation she would bear if the litigation did not succeed. Nor did he detail the billing rates for expenses in the retainer agreement. The expenses for the emails -- $1.00 for every email sent or received -- amounted to just over $1700 and were in addition to the hourly rate he charged. Photocopying costs represented almost $12,000 of the nearly $16,000 in expenses owed at the time Cige's services were terminated.

At the conclusion of the plenary hearing, the trial court invalidated the retainer agreement, crediting Balducci's testimony over Cige's. The Appellate Division affirmed, finding substantial and credible evidence in the record to support the trial court's decision. 456 N.J. Super. 219, 234, 243-44 (App. Div. 2018).

The Appellate Division also articulated a set of ethical obligations, purportedly arising from the Rules of Professional Conduct, that must be followed by attorneys in fee-shifting actions when a retainer agreement includes an hourly fee component. Those obligations are discussed in numbered paragraphs 6-9 below.

The Court granted certification limited to Cige's challenge of the invalidation of the agreement and his claim that the Appellate Division retroactively applied new rules of professional conduct. 236 N.J. 616 (2019).

**HELD:** The invalidation of the retainer agreement is supported by sufficient credible evidence in the record. Although the Appellate Division's concerns over the retainer agreement in this case are understandable, the ethical pronouncements issued in its opinion may have far-reaching and negative effects, not only on employment-law attorneys and attorneys handling fee-shifting claims, but also on their clients. Some of those pronouncements appear too broad and some unsound, and others are worthy of the deliberative process by which new ethical rules are promulgated by the Court. The Court addresses those issues under its constitutional authority to regulate the conduct of attorneys in this State, N.J. Const. art. VI, § 2, ¶ 3, and directs that an ad hoc committee be established to address the professional-responsibility issues discussed in this opinion. The Court expresses no ultimate opinion on the matters referred to the committee, which will report its recommendations to the Court.

1. The paramount principle guiding every fee arrangement is that "[a] lawyer's fee shall be reasonable." RPC 1.5(a). Every lawyer must set forth "the basis or rate of the fee . . . in writing to the client," RPC 1.5(b), and must explain the charges and costs for which the client is responsible, beyond the hourly rate, to permit the client to make an informed decision whether to retain the attorney. A lawyer also has a duty to "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation," RPC 1.4(c), and is forbidden from making "false or misleading communications" relating to "legal fees," RPC 7.1(a)(4). (pp. 20-22)

2

2.  A court's review of a retainer agreement is not limited by the parol evidence rule because ordinary contract principles must give way to the higher ethical and professional standards that govern the attorney-client relationship.  The parol evidence rule cannot bar a client from testifying that she signed a retainer agreement based on an attorney's material misrepresentation.  Further, an agreement susceptible to two reasonable interpretations should be construed in favor of the client.  The attorney bears the burden of establishing the fairness and reasonableness of the transaction.  (pp. 22-24)

3.  Here, the dispute between Cige and Balducci amounted to a credibility contest.  After hearing the testimony of three witnesses, the trial court found that Balducci never agreed to guarantee Cige his hourly rate if the lawsuit did not prevail.  The court, moreover, determined that "a reasonable client" would have viewed the retainer agreement as a typical contingent-fee arrangement, obligating the client to pay a percentage of a monetary recovery only if the lawsuit succeeded.  To the extent that ambiguity rendered the retainer agreement susceptible to more than one reasonable interpretation, the agreement must be construed in favor of the client.  Based on the deference due the trial court's credibility and factual findings and the Court's independent review of the record, the Court is satisfied that the trial court's judgment must be upheld.  (pp. 25-27)

4.  Attorneys and clients can agree to fee arrangements of their choice, provided they do not violate the Rules of Professional Conduct.  The most conventional fee arrangement is for a client to pay an attorney on an hourly basis.  Fee arrangements that provide incentives to lawyers to undertake the representation of clients who are unable or unwilling to pay an hourly rate are also permissible.  The contingent-fee arrangement, in which an attorney is entitled to legal fees only if the client receives a recovery, is one such option.  In addition to its benefits to clients, the attorney likewise has a powerful incentive to accept a contingent-fee agreement -- the potential of receiving legal fees far in excess of what would have been earned by an hourly-rate computation.  Rule 1:21-7 authorizes and circumscribes contingent-fee arrangements.  Significantly, New Jersey's court rules do not place fixed fee caps on contingent fees in statutorily based discrimination cases.  Nevertheless, in all cases, the contingent fee must conform to the rule of reasonableness articulated in RPC 1.5(a).  (pp. 27-30)

5.  Fee arrangements are also based on fee-shifting statutes that provide that, when a plaintiff is the prevailing party in a lawsuit, the defendant is responsible to pay the plaintiff's reasonable attorney's fees and costs.  The fee-shifting provisions in LAD and other fee-shifting statutes do not require proportionality between damages recovered and counsel-fee awards.  A reasonable attorney's fee may exceed the value of the recovery by the plaintiff.  When the attorney and client enter into a contingent-fee arrangement in a LAD case, the statutory-fee award -- the reasonable value of services rendered by the attorney -- may yield a higher return to the attorney than a contingent-fee award.  In such a scenario, the client would receive the damages award and the attorney the statutory award for the reasonable value of his services.  Additionally, in many cases, an hourly-

3

fee arrangement may better serve the client's interests than a contingent-fee arrangement -- provided the client has the resources to pay the hourly fee. These principles are relevant because hourly billing, contingent-fee arrangements, and fee-shifting provisions intersect in the retainer agreement in this appeal. That retainer agreement has prompted pronouncements by the Appellate Division that have raised concerns by three bar associations. (pp. 30-33)

6. The Appellate Division's first directive was that "if an attorney's fee in a LAD or statutory fee-shifting case is based in whole or in part on an hourly rate," then the attorney (1) "must inform the client that if the case becomes complex and protracted, the hourly rate-based fee the client is responsible to pay can approach or even exceed his or her recovery"; (2) "should provide examples of how much hourly fees have totaled in similar cases"; and (3) "must provide the client with approximate costs . . . and must give examples of such costs in similar cases" "if the client is required to advance costs." Balducci, 456 N.J. Super. at 242-43. It is not clear whether the Appellate Division has made a distinction between (1) an hourly rate that is computed based on a reasonable attorney's fee award owed to a plaintiff as the prevailing party in a LAD case and (2) an hourly rate that the client is responsible to pay regardless of the outcome. Amici assert that, while Cige's agreement appears to be an outlier, other hybrid fee agreements are permissible. The Court notes that it currently has no basis to cast ethical doubt on certain hybrid fee arrangements. Attorneys should explain to their clients in fee-shifting cases that the attorney's fees may exceed the recovery by the client and will depend on various unknown factors; however, estimating the value of the case or the number of attorney hours that ultimately will be expended may not be possible with precision. The Court explains why mandating that attorneys in fee-shifting cases "provide examples of how much hourly fees [and costs] have totaled in similar cases" imposes a difficult, if not impossible, task, but notes that at the outset of the attorney-client relationship, the charges for identifiable costs, such as photocopying expenses, should be disclosed. Here, the retainer agreement did not disclose that the client would be charged $1.00 for every email received or sent, in addition to the hourly fee charged for preparing and reading those emails. That charge does not appear to conform to a standard of reasonableness. (pp. 34-38)

7. The Appellate Division next instructed that "the attorney must inform the client [that] other competent counsel represent clients in similar cases solely on a contingent fee basis, without an hourly component," id. at 242, and "must disclose [that] other competent counsel who represent clients in similar cases advance litigation costs," id. at 243. The wide diversity of cases and the varying fee arrangements used by attorneys may not call for the imposition of blunt and broad ethical obligations. And the disclosure requirement must be considered critically because it could impose on an attorney the duty to refer a potential client to a competitor who may be less experienced or skilled merely because that attorney advances litigation costs. (p. 38)

4

8.  The Court also questions the correctness of the Appellate Division's third suggestion -- that when LAD attorneys have not had experience with "similar cases," "consideration should be given to referring the case to a certified civil trial attorney." Id. at 242.  The Court stresses the variety among LAD cases, the fact that some of the finest attorneys in their respective fields have decided not to seek certification, and the lack of available certification for the subspecialty of LAD cases.  (p. 39)

9.  Last, the Appellate Division found "questionable the [retainer agreement's] additional fee of fifteen percent of one year's wages in the event a client who has lost a job based on discrimination is reinstated," id. at 243, and "problematic" the provision computing the contingent fee based on both the client's damages and the statutory fee award, id. at 239-40.  As to the computation provision, the Court notes that such a method may be relatively common and has been authorized by other jurisdictions.  Regarding the reinstatement provision, the Court notes that there may be employment-law cases in which the settlement provides only for reinstatement -- without any financial recovery, and without attorney's fees -- and therefore, it may be that in such a circumstance, a fee taken from a percentage of a year's salary would be reasonable.  (pp. 39-41)

10.  The Court notes that those issues all require careful and thoughtful consideration and deliberation.  The Court generally establishes professional standards governing attorneys through the rulemaking process.  Several Supreme Court committees have overlapping jurisdiction over the professional-responsibility issues raised in this opinion:  the Civil Practice Committee, the Professional Responsibility Rules Committee, and the Advisory Committee on Professional Ethics.  The Court has decided that the study of the professional-responsibility issues should be addressed by a newly established ad hoc committee comprised of representatives of those three committees, and of other representative members of the Bar and Bench with experience in these matters.  The Court therefore will ask the Administrative Director of the Courts to select members for this committee for the Court's approval.  (p. 41)

11.  This committee of experienced judges and attorneys will make recommendations on the questions raised in this opinion.  With the valuable input and insight from the committee, the Court then will be able to carefully survey all viewpoints and deliberate before considering any new rule of general applicability to the Bar.  The committee may also consider whether to revisit a cap on contingent fees in statutorily based discrimination and employment claims.  See R. 1:21-7(c).  The Court expresses no ultimate opinion on the matters referred to the committee.  (p. 42)

**The judgment of the Appellate Division is AFFIRMED.**

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE ALBIN's opinion.**

Lisa Balducci,

Plaintiff-Respondent,

v.

Brian M. Cige,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
456 N.J. Super. 219 (App. Div. 2018).

| Argued | Decided |
|--------|---------|
| October 24, 2019 | January 29, 2020 |

Brian M. Cige argued the cause for appellant (Law
Offices of Brian M. Cige, attorneys; Brian M. Cige on
the briefs).

Jay J. Rice argued the cause for respondent (Nagel
Rice, attorneys; Jay J. Rice, of counsel and on the
briefs, and Randee M. Matloff and Michael J.
Paragano, on the briefs).

Edward J. Zohn argued the cause for amicus curiae
New Jersey State Bar Association (New Jersey State
Bar Association, attorneys; Evelyn Padin, President,
of counsel, and Edward J. Zohn, William E. Denver,
and Thomas H. Prol, on the brief).

Richard M. Schall argued the cause for amicus curiae National Employment Lawyers Association of New Jersey (Schall & Barasch, attorneys; Richard M. Schall, on the brief).

Benjamin Folkman argued the cause for amicus curiae New Jersey Association for Justice (Folkman Law Offices, attorneys; Benjamin Folkman, on the brief).

JUSTICE ALBIN delivered the opinion of the Court.

A retainer agreement between a lawyer and a client is not an ordinary contract subject to the rules of the marketplace. It is a contract that must conform to the Rules of Professional Conduct that guide lawyers in their dealings with prospective clients. A lawyer stands in a fiduciary relationship with a prospective client and must act within the ethical constraints commanded by professional standards of responsibility. A retainer agreement must be fair and understandable, and the fee arrangement must be reasonable. The oral assurances that the attorney gives the client should not be different from the written words in the retainer agreement. Those general principles are key to the resolution of this appeal.

Plaintiff Lisa Balducci retained defendant Brian Cige to represent her son in a bullying lawsuit brought against a school district under New Jersey's Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49. The written retainer agreement seemingly ensured Cige the highest calculation of legal fees

2

under three potential scenarios: (1) his hourly rate multiplied by hours worked, regardless of whether the lawsuit prevailed; (2) a contingent fee of thirty-seven-and-one-half percent (37 1/2%) of the net recovery combined with any statutory attorney's fees awarded under LAD; or (3) the statutory attorney's fees under LAD awarded by judgment or settlement. The agreement guaranteed that Cige would bear no financial risk but possibly benefit from a windfall of legal fees.

Three years into the LAD litigation, Balducci switched attorneys and instituted a declaratory-judgment action to invalidate the retainer agreement on the ground that Cige procured the agreement in violation of the Rules of Professional Conduct. A Superior Court judge voided the agreement, finding that Cige orally promised Balducci that she would not be responsible for legal fees if the lawsuit did not succeed, despite the terms of the retainer agreement that suggested otherwise. The court found that Cige was entitled only to the quantum meruit of his legal fees.

The Appellate Division affirmed the trial court's judgment. But it also made a number of pronouncements purportedly imposing new ethical obligations on attorneys handling LAD and other fee-shifting claims. Cige and several bar associations assert that the newly imposed professional obligations are at odds with the current practices of attorneys who handle employment-law

3

and other fee-shifting cases and are not mandated by the Rules of Professional Conduct. Any new professional obligations, they maintain, should have been vetted through the Court's rulemaking process.

We agree that the invalidation of the retainer agreement is supported by sufficient credible evidence in the record and therefore affirm the judgment of the Appellate Division. Although the Appellate Division's concerns over the retainer agreement in this case are understandable, the ethical pronouncements issued in its opinion may have far-reaching and negative effects, not only on employment-law attorneys and attorneys handling fee-shifting claims, but also on their clients. Some of those pronouncements appear too broad and some unsound, and others are worthy of the deliberative process by which new ethical rules are promulgated by this Court.

We will address those issues under our constitutional authority to regulate the conduct of attorneys in this State. N.J. Const. art. VI, § 2, ¶ 3.

## I.

In September 2012, Balducci retained Cige to represent her high-school age son in a bullying lawsuit, brought under LAD, against a school district. Three years later, Balducci terminated Cige's representation and retained another lawyer to handle the case. In July 2016, Balducci filed a declaratory-judgment action to void the retainer agreement on the ground that it violated

4

the Rules of Professional Conduct. In turn, Cige counterclaimed, demanding all legal fees and expenses owed under the retainer agreement.

A Superior Court judge conducted a two-day plenary hearing at which Balducci, her son, and Cige testified.

Balducci's Testimony

Balducci testified that, in September 2012, she approached Cige about bullying that her son had encountered in school, which had a devastating impact on his psychological and physical health. She went to Cige because he was "one of [her] very close friends." Cige socialized with her, had attended her wedding, and had represented her in a prior legal matter. Cige explained to her that he had the experience to handle the lawsuit against the school district.

Cige presented Balducci with what he described as a standard retainer agreement for a LAD case. Balducci was not an unsophisticated client, having worked for lawyers, owned a title company, and invested in real estate ventures. She raised questions about language in the retainer agreement that seemingly made her the guarantor of all legal fees and costs, even if the lawsuit failed. Cige told her not to be alarmed by the "standard language" in the retainer agreement. He assured her that the attorney's fees would be paid by the school board, not by her, saying, "[w]e are friends. I was at your wedding. I would never do this to you. Ignore that." (That account was

5

corroborated by Balducci's son, who testified that he was present during the meeting.) Trusting Cige as a friend, Balducci signed the retainer agreement, which, in relevant part, is set forth below:

> 3. Legal Fees. The Law firm cannot predict or guarantee what your final bill will be. This will depend on the amount of time spent on your case and the amount of other expenses.
>
> A. Initial Payment. The Law firm will begin work on your case upon receipt of $3,750.00. This sum will be used to pay for your initial filing fee, other fees and expenses, and legal fees, according to this Agreement.
>
> B. Retainer. You agree to pay $7,500.00* as the minimum retainer, but maximum amount for legal fees to be paid until case is settled or judgment is entered. Notwithstanding, you are encouraged to make additional payments toward legal fees as invoiced to minimize having a large invoice when the case ends.
>
> *$3,750.00 to be paid within[] ninety (90) days of signing this Agreement.
>
> C. Legal Fee. You agree to pay the Law Firm for legal services the greater of:
>
> i. Rate Per Hour    Services of
> $475.00       Brian M. Cige, Esq.
>
> (This hourly rate[] is subject to review and revision on 1 January 2014 and annually thereafter. Further, at the Law Firm's discretion, it may either use the rates which

6

were current when the services were performed and adding interest at the regular rate for paying clients or using the rate current at the time the payment is made.)

    ii.    thirty seven and one half percent (37 1/2%) of the net recovery (including attorneys fees referred to in iii below).

    iii.    statutory attorneys fees, by settlement or award, received with credit for all payments received.

    Client has been advised that, in employment cases, the employer may offer reinstatement of his or her prior position or a comparable position. In the event the client accepts an offer of reinstatement, the client agrees to pay the Law Firm fifteen additional percent (15%) of the total pay he or she would receive from the employer upon reinstatement for a one (1) year pay period, in no more than six (6) equal monthly installments.

D.  All Services Will Be Billed.  You will be billed at the hourly rate set forth in paragraph 3C for all services rendered.  This includes telephone calls (minimum charge of 6 minutes), dictating and reviewing letters, travel time to and from meetings and the Court, legal research, negotiations and any other service relating to this matter.  Client hereby gives the Law Firm a continuing lien on the client's claim and the proceeds thereof for the amount of the attorney's fees, out-of-pocket expenses, and costs for which the client is obligated under this agreement.  The attorney's lien is given by the client pursuant to New Jersey [Statutes] Annotated Title 2A:13-5.

7

4. Costs and Expenses. In addition to legal fees, you must pay the following costs and expenses: experts' fees, court costs, accountants' fees, appraisers' fees, service fees, investigators' fees, deposition costs, messenger services, photocopying charges, telephone toll calls, postage and any other necessary expenses in this matter. The Law Firm may require that expert(s) be retained directly by you. You would then be solely responsible to pay the expert(s).

5. Bills. The Law Firm will send you itemized bills from time to time. The Law Firm may require that costs and expenses (see paragraph 4) be paid in advance. All bills for costs and legal expenses are due upon receipt and failure to pay will waive any discounts. You will be charged interest at a monthly rate of one and one-half percent (1 1/2%) on any remaining balance not paid within thirty (30) days from the date of the bill. If an outstanding balance necessitates collection efforts . . . the Law Firm will be paid its legal fees for collecting same. Further, at the Law Firm's discretion, it may either use the rates which were current when the services were performed and adding interest at the regular rate for paying clients or using the rate current at the time the payment is made.

By October 2012, Balducci had paid the $7500 minimum retainer. Balducci accepted her financial obligation to pay the expenses and, over the next three years, paid approximately $18,000 to $19,000 for the cost of experts' fees, depositions, photocopies, and other items. The expenses that Cige claimed were still due, however, exceeded those payments.

8

In 2013, Balducci received invoices reflecting the hourly legal fees owed and became very upset. She called Cige, who explained that he forwarded the invoices only because of his legal obligation to keep track of his billing. He also confided that he was "padding" the bills, stating that the school board would be responsible for the legal fees after the successful conclusion of the case. Because of her expressed discomfort at receiving the invoices, he agreed to stop sending them.

By early 2015, Balducci became dissatisfied with Cige's handling of the case. Cige saddled her with the preparatory work for depositions while he spent time at chess tournaments, and he was not adequately prepared for the depositions. The mounting expenses also made her anxious. In September 2015, Balducci received an invoice for $12,400.61 in unpaid expenses, and Cige estimated that his legal fees totaled $200,000.

The school board rejected Balducci's first settlement demand of $3,500,000. After consulting with an expert in bullying cases, Cige approximated the value of the case at somewhere between $500,000 and $700,000.

By October 2015, weighed down by the multiplying expenses and disenchanted with her attorney, Balducci retained a law firm willing to front the expenses and terminated Cige's services. Only at that point did Cige

9

inform her that she was responsible for the payment of his hourly fees, which, by February 9, 2016, had climbed to $270,791.22.

Cige's Testimony

Cige gave a very different account of his relationship with Balducci and the terms of their agreement. He began by stating that he had "more than twenty-five years of experience litigating [LAD] cases" and had "some experience in bullying law." He had tried ten to twelve jury trials and fifteen to twenty non-jury trials. He also had represented a Somerville high school student in a bullying case against a board of education, though he had never tried a bullying case to conclusion. Cige had lectured on subjects such as LAD and disability discrimination as well as bullying, but was not designated a certified civil trial attorney.

Balducci was not a close social acquaintance, however Cige had successfully represented her in a litigated matter. According to Cige, under the retainer agreement, he was entitled to the greater of three alternate methods of calculating his fee: (1) his hourly rate multiplied by the number of hours worked; (2) a contingent fee of 37 1/2% of both the net recovery and any award of statutory attorney's fees; or (3) an award of statutory attorney's fees. Cige maintained that Balducci had the responsibility to pay his hourly fees,

regardless of whether the case prevailed. He denied making any statement to Balducci that conflicted with the written terms of the retainer agreement.

Cige asserted that Balducci reviewed the retainer agreement in his office and that he asked her if she had any questions before she signed it. Cige, however, admitted that he did not inform Balducci of the potential value of the case, of the potential litigation expenses, or of the estimated financial obligation she would bear if the litigation did not succeed. Nor did he detail the billing rates for expenses in the retainer agreement. Instead, he later forwarded a letter to Balducci indicating that he billed "$0.25 per page for photocopies, $1.00 per email, $1.00 per fax, $0.55 per mile, and $25.00 for New Jersey Lawyers Service." The expenses for the emails -- $1.00 for every email sent or received -- amounted to just over $1700 and were in addition to the hourly rate he charged. Photocopying costs represented almost $12,000 of the nearly $16,000 in expenses owed to Cige at the time his services were terminated.

Cige tendered to the school board a $3,500,000 settlement demand, a figure he thought high, to comply with his client's wishes. He believed the case had substantial value because Balducci's son had suffered severe harm from the bullying. He did not discuss with Balducci the settlement value in other cases, because the unique facts of each case do not permit reliable

11

comparisons. By letter dated September 3, 2015, Cige advised Balducci that he estimated the settlement value of her son's case to be between $500,000 and $700,000 and that a successful trial would probably yield between $1,000,000 and $1,200,000. He also indicated to her that the settlement value would increase as the legal fees increased.

Balducci's dissatisfaction with his representation manifested itself after his estimate of the case's value did not meet her expectations and after she received invoices for outstanding expenses. On January 19, 2016, months after his services were terminated, Cige advised Balducci that she still owed $15,955.45 in expenses. Approximately three weeks later, Balducci forwarded a check in the amount of $6122.62 for the expenses she considered valid. Cige responded two days later, informing Balducci that in addition to the outstanding expenses, she owed legal fees totaling $270,791.22.

On March 10, 2016, Balducci initiated fee arbitration. The Fee Arbitration Committee, however, declined jurisdiction because the amount in dispute exceeded $100,000. Thereafter, Balducci filed the declaratory-judgment complaint.

12

II.

A.

At the conclusion of the plenary hearing, the trial court invalidated the retainer agreement, crediting Balducci's testimony over Cige's. The court determined that "a reasonable client would have understood [the] retainer agreement" as a typical contingent-fee arrangement in which the client is obligated to pay legal fees only if the lawsuit is successful. It next determined that Cige did not fulfill his duty "to communicate clearly that his fee structure was different" and that Balducci was required to pay legal fees regardless of the case's success, citing RPC 1.4(c). The court accepted Balducci's testimony that Cige informed her that his hourly fees would be paid by the school board -- not by her.

The court enumerated other professional failings by Cige: (1) he did not advise Balducci "of the average settlement in matters much like hers"; (2) he did not "articulate how expensive [Balducci's] matter could ultimately be, and what recovery [she] could expect (within reason)"; and (3) he did not identify in the retainer agreement numerous costs that would be charged, "including, most egregiously, $1 per email sent and received." The court found that Cige had failed to impart information "material and necessary to permit [Balducci]

13

to make an informed decision regarding representation" in violation of the Rules of Professional Conduct.

Last, the court credited Balducci's testimony that she never would have retained Cige to represent her son "had she known she would be liable to pay [Cige's] hourly rate even in the event her claims were unsuccessful." Accordingly, the court voided the retainer agreement and limited Cige's legal fees to "the quantum meruit of [his] work" to be determined at a later hearing.

B.

The Appellate Division affirmed, finding substantial and credible evidence in the record to support the trial court's decision. Balducci v. Cige, 456 N.J. Super. 219, 234, 243-44 (App. Div. 2018). The Appellate Division highlighted the testimony and evidence credited by the trial court: Cige not only failed to explain that "the cost of his services, based on his hourly rate and liberal billing practices, could approach or exceed [Balducci's] recovery," but also "represented -- or misrepresented as the case may be -- that he would not charge her his hourly rate." Id. at 234. It found the retainer agreement unenforceable because Cige "did not adequately inform [Balducci] about [its] ramifications," not "because of the problematic nature of the three fee provisions." Id. at 241.

14

The Appellate Division, additionally, spoke more expansively about an attorney's ethical obligation to inform his client of the ramifications of a retainer agreement in fee-shifting cases, given the "ambiguous if not misleading" nature of the agreement in this case. Id. at 234.

It noted that LAD's fee-shifting provision is designed to attract competent counsel to enforce the statutory rights of victims of discrimination. Id. at 236. It then made the following observations: (1) "in the absence of a statutory fee award, an attorney's hourly fee can approach or exceed a LAD client's recovery"; (2) a retainer agreement in a LAD case that places the onus on the client to pay the hourly fee can greatly diminish the client's damages award, thus undermining LAD's policy of "compensating victims of discrimination," and, in the event of an unsuccessful outcome, financially devastate the client; and (3) "[t]here is no dearth of competent, civic-minded attorneys willing to litigate LAD and other statutory fee-shifting cases under fee agreements that do not include an hourly component." Ibid. With those observations in mind, the Appellate Division articulated a set of ethical obligations, purportedly arising from the Rules of Professional Conduct, that must be followed by attorneys in LAD and fee-shifting actions when a retainer agreement includes an hourly fee component.

15

First, "if an attorney's fee in a LAD or statutory fee-shifting case is based in whole or in part on an hourly rate, then the attorney is ethically obligated to inform the client of the ramifications." Id. at 242. Thus, "[t]he attorney must inform the client that if the case becomes complex and protracted, the hourly rate-based fee the client is responsible to pay can approach or even exceed his or her recovery." Ibid. In addition, "[t]he attorney should provide examples of how much hourly fees have totaled in similar cases," ibid., and "if the client is required to advance costs, the attorney must provide the client with approximate costs . . . and must give examples of such costs in similar cases," id. at 243.

Second, "the attorney must inform the client [that] other competent counsel represent clients in similar cases solely on a contingent fee basis, without an hourly component," id. at 242, and "must disclose [that] other competent counsel who represent clients in similar cases advance litigation costs," id. at 243.

Third, if an attorney does not have experience with similar LAD cases, "consideration should be given to referring the case to a certified civil trial attorney." Id. at 242.

Last, the Appellate Division found "questionable the [retainer agreement's] additional fee of fifteen percent of one year's wages in the event

16

a client who has lost a job based on discrimination is reinstated," id. at 243, and "problematic" the provision computing the contingent fee based on both the client's damages and the statutory fee award, id. at 239-40.

C.

We granted Cige's petition for certification limited to his challenge of the invalidation of the retainer agreement and his claim that the Appellate Division retroactively applied new rules of professional conduct. 236 N.J. 616, 616-17 (2019). We also granted the motions of the New Jersey State Bar Association, the National Employment Lawyers Association of New Jersey, and the New Jersey Association for Justice to participate as amici curiae.

III.

A.

Cige claims that the Appellate Division erred in affirming the invalidation of the retainer agreement. He alleges that the retainer agreement is a clear and unambiguous "integrated written" contract and therefore the parol evidence rule barred oral testimony collaterally attacking the validity of the agreement. He also contends that the Appellate Division improperly created and then retroactively applied new ethical standards on attorneys handling LAD and other fee-shifting cases, requiring, among other things, that clients be informed how other attorneys bill similar cases.

17

B.

Balducci asks this Court to affirm the Appellate Division, which found ample evidence to uphold the trial court's factual findings that Cige failed to explain material terms of the retainer agreement to her, thus rendering the agreement unenforceable. She points to the trial court's finding that she signed the retainer agreement only because Cige assured her that the agreement was a contingent-fee arrangement and that she would not be responsible for his legal fees if the lawsuit were unsuccessful.

C.

The three amici claim that the Appellate Division made novel and ill-considered pronouncements on the Rules of Professional Conduct applicable in statutory fee-shifting cases that were unnecessary to decide the narrow facts before it. Amici assert that those pronouncements amounted to rulemaking that falls within the exclusive domain of the Supreme Court -- rulemaking that is ordinarily preceded by careful consideration and review by Supreme Court committees and input from the Bar.

Amici contend that the client's right to an attorney's fee award as a prevailing party in a fee-shifting case does not exclude an attorney from contracting with a client for payment of services on an hourly basis with or without a contingent-fee arrangement.

18

Amici take issue with newly ordained ethical requirements imposed on attorneys who charge wholly or partly on an hourly basis in fee-shifting cases, and make some general points. In a LAD fee-shifting case, for example, a client may be better served by a retainer agreement based on an hourly fee than a contingent fee when the proofs are strong, success is expected, and the recovery likely will be very high. In that circumstance, a contingent-fee arrangement might reap an unwarranted windfall for an attorney. Therefore, referring the client to an attorney who would take the case on a contingent basis might not be in the client's best interests.

Amici also submit that LAD attorneys should not be responsible for advising their clients of other attorneys' billing practices because they have no access to such information and no obligation to conduct market research or investigate their competitors' practices. Amici reject the suggestion that experienced and skilled LAD attorneys, who have not handled a "similar" case, should refer the client to a certified civil trial attorney who may have less experience and expertise in LAD matters. According to amici, the Appellate Division unfairly criticized the varied hourly billing arrangements commonly used in LAD cases that properly apportion risk between attorneys and clients and failed to give guidance to attorneys in fulfilling the new ethical mandates.

19

IV.

The Appellate Division's decision requires that this Court address two distinct issues. The first is whether the trial court properly invalidated the retainer agreement between Balducci and Cige. The second is whether some of the Appellate Division's general pronouncements on professional standards applicable in fee-shifting cases exceeded the bounds of its charge.

We start with general ethical principles that relate to the conduct of attorneys in their relationships with clients.

A.

This Court has exclusive constitutional authority to regulate the practice of law by establishing ethical duties that attorneys owe their clients and potential clients. N.J. Const. art. VI, § 2, ¶ 3; Am. Trial Lawyers Ass'n, N.J. Branch v. Supreme Court, 66 N.J. 258, 262-63 (1974). Those ethical obligations are set forth in the Rules of Professional Conduct and court rules and have been further refined by our case law. See R. 1:14 ("The Rules of Professional Conduct . . . as amended and supplemented by the Supreme Court . . . shall govern the conduct of the members of the bar and the judges and employees of all courts of this State.").

A retainer agreement between an attorney and client is a contract, but not an ordinary contract. "[T]he unique and special relationship between an

20

attorney and a client" requires that a retainer agreement satisfy not only ordinary principles governing contracts, but also the professional ethical standards governing the attorney-client relationship. Alpert, Goldberg, Butler, Norton & Weiss, P.C. v. Quinn, 410 N.J. Super. 510, 529 (App. Div. 2009) (quoting Cohen v. Radio-Elecs. Officers Union, Dist. 3, 275 N.J. Super. 241, 259 (App. Div. 1994), modified, 146 N.J. 140 (1996)).

Because lawyers stand in a fiduciary relationship with their clients, see Alpert, 410 N.J. Super. at 531, they must act fairly in all their dealings with them, see In re Humen, 123 N.J. 289, 299-300 (1991). Fee agreements that contravene the Rules of Professional Conduct and public policy are not enforceable. See Tax Auth., Inc. v. Jackson Hewitt, Inc., 187 N.J. 4, 15 (2006).

The paramount principle guiding every fee arrangement is that "[a] lawyer's fee shall be reasonable." RPC 1.5(a). Every lawyer must set forth "the basis or rate of the fee . . . in writing to the client."[1] RPC 1.5(b). That professional imperative requires that the lawyer also make a "[f]ull and complete disclosure of all charges which may be imposed upon the client." Alpert, 410 N.J. Super. at 531; see also Michels, New Jersey Attorney Ethics

---

[1] The only exception to that rule is when the lawyer has regularly represented the client. RPC 1.5(b).

21

§ 33:4-1 (2019). An attorney must explain the charges and costs for which the client is responsible, beyond the hourly rate, to permit the client to make an informed decision whether to retain the attorney. Alpert, 410 N.J. Super. at 531.

A lawyer also has a corresponding duty to "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation," RPC 1.4(c), and is forbidden from making "false or misleading communications" relating to "legal fees," RPC 7.1(a)(4). "[C]lear communication about the basis of the fee and the services it will cover should be the objective of every fee agreement." Michels, § 33:1. In determining the validity of a retainer agreement, a court may consider the circumstances related to the making of the agreement, including whether the parties "actually negotiated the agreement," "the client's level of sophistication or experience in retaining and compensating lawyers," and other relevant factors. See Cohen v. Radio-Elecs. Officers Union, Dist. 3, 146 N.J. 140, 160 (1996); see also Restatement (Third) of the Law Governing Lawyers § 18 cmt. h (Am. Law Inst. 2000).

A court's review of the validity of a retainer agreement is not limited by the parol evidence rule. See Restatement (Second) of Contracts § 214(d) (Am. Law Inst. 1981) ("Agreements and negotiations prior to or contemporaneous

22

with the adoption of a writing are admissible in evidence to establish . . . illegality, fraud, . . . or other invalidating cause . . . ."); accord Conway v. 287 Corp. Ctr. Assocs., 187 N.J. 259, 269-70 (2006) (noting that the words of the retainer agreement did not preclude "a broad use of extrinsic evidence to achieve the ultimate goal of discovering the intent of the parties"). The parol evidence rule generally "prohibits the introduction of evidence that tends to alter an integrated written document." See Conway, 187 N.J. at 268 (citing Restatement (Second) of Contracts § 213). That rule does not apply to retainer agreements because "ordinary contract principles . . . must give way to the higher ethical and professional standards" that govern the attorney-client relationship. See Alpert, 410 N.J. Super. at 529. An attorney cannot give an oral assurance to a client that conflicts with a written retainer agreement and expect to find refuge in the parol evidence rule. See RPC 7.1(a). The parol evidence rule cannot bar a client from testifying that she signed a retainer agreement based on an attorney's material misrepresentation.

We also must be mindful that lawyers typically prepare retainer agreements, that clients rely on the integrity of their lawyers who fashion the agreements, and that, as such, an agreement susceptible to two reasonable interpretations should be construed in favor of the client. See Starkey, Kelly, Blaney & White v. Estate of Nicolaysen, 172 N.J. 60, 67 (2002); Cohen, 146

23

N.J. at 156; see also Restatement (Third) of the Law Governing Lawyers § 18 cmt. h. When a court reviews a retainer agreement, it should do so "from the standpoint of a reasonable person in the client's circumstances." Restatement (Third) of the Law Governing Lawyers § 18 cmt. h; see Cohen, 146 N.J. at 156.

Ultimately, "the attorney bears the burden of establishing the fairness and reasonableness of the transaction." Cohen, 146 N.J. at 156.

B.

Before applying those principles to the case before us, we begin with our standard of review. Although the interpretation of a contract is generally subject to de novo review, Keiffer v. Best Buy, 205 N.J. 213, 222-23 (2011), we apply a deferential standard here because the trial court determined the validity of the retainer agreement by taking the testimony of the parties and by making credibility and factual findings, see Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Id. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). That is so because an appellate court's review of a cold record is no substitute for the trial court's opportunity to hear and see the witnesses who testified on the stand. See State v. Elders, 192 N.J. 224, 244 (2007). We may not overturn the

24

trial court's factfindings unless we conclude that those findings are "manifestly unsupported" by the "reasonably credible evidence" in the record. Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011) (quoting In re Tr. Created By Agreement Dated Dec. 20, 1961, 194 N.J. 276, 284 (2008)).

## C.

We first conclude that the trial court's factfindings in support of the invalidation of the retainer agreement are grounded in sufficient credible evidence in the record. A retainer agreement must be viewed through the prism of a lawyer's ethical responsibilities as commanded by the Rules of Professional Conduct. The trial court's purview extended beyond the four corners of the retainer agreement to a consideration of all the circumstances that led the parties to reach an agreement. See Cohen, 146 N.J. at 160. In this setting, the parol evidence rule cannot place a stranglehold on the admission of extrinsic evidence, particularly the testimony of the client and attorney. Through the testimony of the parties, the court had to determine the nature of the actual agreement that had been reached and whether oral promises conflicted with the agreement reduced to writing.

At its core, the dispute between Cige and Balducci amounted to a credibility contest. After hearing the testimony of three witnesses, the trial court found that Balducci never agreed to guarantee Cige his hourly rate if the

25

lawsuit did not prevail. The trial court credited Balducci's and her son's testimony that Cige gave oral assurances that, despite the written language in the retainer agreement, Balducci would never have to pay the hourly rate. The court accepted Balducci's assertion that she would not have retained Cige had he informed her that she would be responsible for his hourly fees if the lawsuit failed. The court, moreover, determined that "a reasonable client" would have viewed the retainer agreement as a typical contingent-fee arrangement, obligating the client to pay a percentage of a monetary recovery only if the lawsuit succeeded. To the extent that ambiguity rendered the retainer agreement susceptible to more than one reasonable interpretation, the agreement must be construed in favor of the client. See Cohen, 146 N.J. at 156. Based on the deference we must accord the trial court's credibility and factual findings and our independent review of the record, we are satisfied that the trial court's judgment must be upheld.

We note that the court additionally indicated that Cige fell short of his duty to impart material information so that Balducci could make an informed decision about whether to retain him -- information concerning the "average settlement" in such cases, the range of recovery to be expected, and the expenses involved, including what the court described as the egregious

26

charging of $1.00 per email. We will address the practicability of imposing on attorneys those and other obligations later.

In sum, we hold that sufficient credible evidence in the record supports invalidating the retainer agreement and limiting Cige to the quantum meruit value of his services.

## V.

## A.

We now address some of the central concerns raised by amici and Cige -- that the Appellate Division has imposed new and unfair mandates on practitioners in LAD and other fee-shifting cases.

We begin with some basic precepts relating to fee arrangements and the import of the LAD fee-shifting provision in such arrangements.

Attorneys and clients can agree to fee arrangements of their choice, provided they do not violate the Rules of Professional Conduct. The most conventional fee arrangement is for a client to pay an attorney on an hourly basis. See generally Ted Schneyer, Legal-Process Constraints on the Regulation of Lawyers' Contingent Fee Contracts, 47 DePaul L. Rev. 371, 375 (1998). Fee arrangements that provide incentives to lawyers to undertake the representation of clients who are unable or unwilling to pay an hourly rate are also permissible.

27

The contingent-fee arrangement is one such option. Am. Trial Lawyers Ass'n, N.J. Branch v. Supreme Court, 126 N.J. Super. 577, 582 (App. Div.), aff'd, 66 N.J. 258 (1974). In a contingent-fee agreement, the attorney agrees to provide legal services for compensation that is contingent on the successful outcome of the case by settlement or judgment, and compensation is fixed by a percentage of the net recovery. See R. 1:21-7(a); see also Am. Trial Lawyers Ass'n, 126 N.J. Super. at 582. In a contingent-fee arrangement, the attorney is entitled to legal fees only if the client receives a recovery. See R. 1:21-7(a).

Such an arrangement has obvious benefits to the client. The attorney assumes most of the risk -- no recovery, no legal fees, see ibid., although, depending on the terms of the retainer agreement, the client may be responsible for expenses, see generally Michels, § 33:3-2(d). A contingent-fee arrangement also opens the courthouse door to the poor and those with modest incomes, who are unable to pay an attorney's hourly rate. See Douglas R. Richmond, Turns of the Contingent Fee Key to the Courthouse Door, 65 Buff. L. Rev. 915, 915-16 (2017). The attorney likewise has a powerful incentive to accept a contingent-fee agreement -- the potential of receiving legal fees far in excess of what would have been earned by an hourly-rate computation. See id. at 917-18 (surveying cases and noting that "some cases are potentially much

28

more lucrative on a contingent fee basis than they would be if the firm billed by the hour").

Rule 1:21-7 authorizes and circumscribes contingent-fee arrangements. A.W. v. Mount Holly Twp. Bd. of Educ., 453 N.J. Super. 110, 119 (App. Div. 2018). In all cases concerning a contingent-fee arrangement, the attorney must first "advise[] the client of the right and afford[] the client an opportunity to retain the attorney under an arrangement for compensation on the basis of the reasonable value of the services." R. 1:21-7(b). In cases involving "the alleged tortious conduct of another, . . . but excluding statutorily based discrimination and employment claims," Rule 1:21-7(c) sets limits on the percentage of recovery that an attorney may receive. Thus, in a tort case, the attorney's compensation is limited to "33 1/3% on the first $750,000 recovered." R. 1:21-7(c) (setting forth declining percentages of compensation for amounts over $750,000).

Significantly, our court rules do not place fixed fee caps on contingent fees in statutorily based discrimination cases. See ibid. Nevertheless, in all cases, the contingent fee must conform to the rule of reasonableness articulated in RPC 1.5(a). R. 1:21-7(e); see also A.W., 453 N.J. Super. at 121; Advisory Comm. on Prof'l Ethics, Op. 715 (N.J. 2008) (noting that in a consumer protection fee-shifting case, "[a] 50 percent contingency . . . cannot per se be

deemed to be 'reasonable'" and must be judged by the factors in RPC 1.5(a)). "[T]he element of uncertainty of recovery is often important in determining whether a contingent fee as ultimately charged is reasonable or excessive." In re Reisdorf, 80 N.J. 319, 329 (1979).

B.

Fee arrangements are also based on fee-shifting statutes that provide that, when a plaintiff is the prevailing party in a lawsuit, the defendant is responsible to pay the plaintiff's reasonable attorney's fees and costs. LAD is one such fee-shifting statute. See N.J.S.A. 10:5-27.1; Pinto v. Spectrum Chems. & Lab. Prods., 200 N.J. 580, 593 (2010). LAD is remedial social legislation intended to combat various forms of discrimination in our society. See N.J.S.A. 10:5-3; see also Caraballo v. City of Jersey City Police Dep't, 237 N.J. 255, 267 (2019). To incentivize attorneys to undertake LAD claims, particularly when the claims have small monetary value, the Legislature enacted a provision allowing that a prevailing plaintiff "may be awarded a reasonable attorney's fee as part of the cost." N.J.S.A. 10:5-27.1; see also Pinto, 200 N.J. at 593. The purpose of the fee-shifting provision is to attract competent counsel to serve as "private attorneys general" to enforce the statutory rights of victims of discrimination, thus vindicating individual rights and advancing societal goals. Pinto, 200 N.J. at 593 (quoting Evans v. Jeff D.,

30

475 U.S. 717, 745 (1986) (Brennan, J., dissenting)); New Jerseyans for a Death Penalty Moratorium v. Dep't of Corr., 185 N.J. 137, 152-53 (2005).

The fee-shifting provisions in LAD and other fee-shifting statutes do not "require proportionality between damages recovered and counsel-fee awards even if the litigation . . . vindicates no rights other than those of the plaintiff." Szczepanski v. Newcomb Med. Ctr., Inc., 141 N.J. 346, 366 (1995) (LAD case); see also Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 23 (2004) (adopting the same non-proportionality approach in a Consumer Fraud Act case). A reasonable attorney's fee may exceed the value of the recovery by the plaintiff. See, e.g., Abrams v. Lightolier Inc., 50 F.3d 1204, 1211, 1221-22 (3d Cir. 1995) (affirming an award of attorney's fees under LAD in the amount of $546,379.59 where the damages award totaled only $473,953.45); Gallo v. Salesian Soc'y, Inc., 290 N.J. Super. 616, 659-60 (App. Div. 1996) (affirming an award of attorney's fees under LAD in the amount of $48,750 where the damages award totaled only $24,000).

When the attorney and client enter into a contingent-fee arrangement in a LAD case, the statutory-fee award -- the reasonable value of services rendered by the attorney -- may yield a higher return to the attorney than a contingent-fee award. For example, assuming a retainer agreement had a one-third contingent-fee component, and the plaintiff succeeds in the LAD action, with

31

the jury awarding $100,000 in monetary damages and the court awarding $100,000 in reasonable attorney's fees, the contingent fee would not represent the reasonable value of the attorney's services.  In such a scenario, the client would receive the damages award and the attorney the statutory award for the reasonable value of his services.  See Szczepanski, 141 N.J. at 366 ("The LAD's fee-shifting provision, N.J.S.A. 10:5-27.1, was intended to assure that counsel for litigants like plaintiff will receive reasonable compensation for services reasonably rendered to effectuate the LAD's objectives, even if the contingent fee payable based on the damages recovered did not constitute a reasonable fee for those services.").

Additionally, in many cases, an hourly-fee arrangement may better serve the client's interests than a contingent-fee arrangement -- provided the client has the resources to pay the hourly fee.  That is because "[i]f the risk of nonpayment to a lawyer is small or nonexistent, resort to a contingent arrangement with its potential for a much larger fee, can be unfair and inequitable to the client."  Reisdorf, 80 N.J. at 329.

These principles are relevant because hourly billing, contingent-fee arrangements, and fee-shifting provisions intersect in the retainer agreement in this appeal.  That retainer agreement has prompted pronouncements by the Appellate Division that have raised concerns by three bar associations.

The Appellate Division found the written retainer agreement here "problematic" because the attorney benefitted from the greater of a contingent fee, a statutory award of attorney's fees, and the attorney's hourly fee, <u>win or lose</u>. Under that agreement, all the risk was borne by the client. If the lawsuit prevailed, the attorney potentially could receive a windfall under the contingent-fee arrangement; if the lawsuit failed, the client potentially could be bankrupted by hundreds of thousands of dollars in fees owed to the attorney under the hourly-fee arrangement. Would a reasonably well-informed client agree to such an arrangement? The answer is, probably not. Balducci stated that she would not have done so. None of the amici came to the defense of this form of retainer agreement.

Amici assert that the Appellate Division has overreacted to the extremity of this retainer agreement by placing restrictions on otherwise appropriate fee arrangements presently in use in LAD and other fee-shifting cases and by placing unrealistic professional obligations on attorneys who handle such cases.

We now turn to some of the Appellate Division's statements that are the focus of the concerns raised by the amici and Cige. We are compelled to address those statements because of their potentially far-reaching impact on the practice of law.

33

## VI.

Amici take issue with the Appellate Division's directive that "if an attorney's fee in a LAD or statutory fee-shifting case is based in whole or in part on an hourly rate," then the attorney (1) "must inform the client that if the case becomes complex and protracted, the hourly rate-based fee the client is responsible to pay can approach or even exceed his or her recovery"; (2) "should provide examples of how much hourly fees have totaled in similar cases"; and (3) "must provide the client with approximate costs . . . and must give examples of such costs in similar cases" "if the client is required to advance costs." Balducci, 456 N.J. Super. at 242-43.

First, it is not clear whether the Appellate Division has made a distinction between (1) an hourly rate that is computed based on a reasonable attorney's fee award owed to a plaintiff as the prevailing party in a LAD case and (2) an hourly rate that the client is responsible to pay regardless of the outcome. One of the amici at oral argument indicated that Cige's retainer agreement, requiring a client to pay the hourly rate in full even if the LAD lawsuit fails, appears to be an outlier. Amici have advised, however, that hybrid fee arrangements that include an hourly fee are used in LAD cases. In such cases, the client will pay an upfront retainer, covering part of the attorney's hourly fees, and then the remaining payment of attorney's fees,

34

whether contingent or statutorily based, depends on whether the lawsuit prevails.  If the suit is successful, then the initial retainer is reimbursed through the attorney's fees awarded by statute or settlement.  In that scenario, we are told the risk is shared by both attorney and client.  Based on the record before us, and without the input of the Professional Responsibility Rules Committee, the Advisory Committee on Professional Ethics, or other relevant Court committees suggesting otherwise, we have no basis to cast ethical doubt on such fee arrangements.[2]

As earlier explained, in a fee-shifting case, the attorney's fees may exceed the recovery by the client.  That clearly should be explained to the client to avoid any misunderstanding later in the litigation, particularly given the fact that most cases are resolved by settlement.  See Alpert, 410 N.J. Super. at 531-32.  For example, an attorney might explain that the value of the LAD claim is likely anywhere between $100,000 and $500,000, but that the final tally of reasonable attorney's fees will depend on various unknown factors, such as whether the discovery process extends over a period of years; whether discovery is labor intensive, involving numerous depositions and review of a

---

[2]  The Advisory Committee on Professional Ethics is designated to issue advisory opinions to answer questions raised concerning the propriety of particular professional practices or an attorney's ethical responsibilities in a particular context.  See R. 1:19-2.

multitude of documents; whether the case is settled or tried, and, if tried, the length of the trial; and whether there are appeals. Meaningful communication with the client and transparency are necessary for the client to make an informed decision. See generally Michels, § 33:1.

On the other hand, attorneys are not clairvoyant and can offer only their best professional judgment. Estimating the value of the case or the number of attorney hours that ultimately will be expended may not be possible with precision. For instance, in any case tried to a jury involving such intangibles as pain and suffering or loss of enjoyment of life, a wide spectrum of acceptable outcomes would be upheld by our courts. Cuevas v. Wentworth Grp., 226 N.J. 480, 500 (2019) ("Because no two juries likely will award the same damages for emotional distress in a discrimination case, a permissible award may fall within a wide spectrum of acceptable outcomes."). Estimating expenses likewise depends on whether a case settles early or goes the distance. Nevertheless, attorneys must give their clients meaningful guidance on their potential financial obligations. See Alpert, 410 N.J. Super. at 530-31.

Mandating that LAD attorneys -- or attorneys in other fee-shifting cases -- "provide examples of how much hourly fees [and costs] have totaled in similar cases" imposes a difficult, if not impossible, task. The attorney would have to know whether the "similar case" settled or was tried, the nature and

36

length of the discovery process, the number of depositions conducted and expert witnesses retained, the overall complexity of the litigation, and many other factors. Amici pose a practical question: how are they to acquire meaningful information about comparable hourly fees and costs? We recently have spoken critically about the "comparative-verdict methodology," noting that the varying awards in LAD and other cases "are not easily susceptible to comparison." Cuevas, 226 N.J. at 486-87. In the same way, attorneys who take on LAD cases are unlikely to have sufficient information on hours and costs in similar cases for any "meaningful comparative approach." See id. at 487.

Nevertheless, an attorney has an obligation to provide the client with meaningful information about the potential aggregate hourly fees and costs that may be incurred during the course of the litigation so that the client may make an intelligent assessment whether to retain the attorney and on what terms. See Alpert, 410 N.J. Super. at 531-32. Clearly, at the outset of the attorney-client relationship, the charges for identifiable costs, such as photocopying expenses, should be disclosed. In the present case, the retainer agreement did not disclose that the client would be charged $1.00 for every email received or sent, in addition to the hourly fee charged for preparing and

37

reading those emails. Such an email charge does not appear to conform to a standard of reasonableness.

Like amici, we have doubts about the soundness of the Appellate Division's command that "the attorney must inform the client [that] other competent counsel represent clients in similar cases solely on a contingent fee basis, without an hourly component." See Balducci, 456 N.J. Super. at 242. As explained earlier, an hourly-rate fee arrangement may benefit a client more than a contingent-fee arrangement in certain cases. The wide diversity of cases and the varying fee arrangements used by attorneys may not call for the imposition of blunt and broad ethical obligations on attorneys.

Currently, many attorneys advance litigation costs, and others do not. We harbor doubts about the Appellate Division's directive that an attorney "must disclose [that] other competent counsel who represent clients in similar cases advance litigation costs." See id. at 243. Must an attorney refer a potential client to a competitor who may be less experienced or skilled merely because that attorney advances litigation costs? The answer to that question suggests that the Appellate Division's disclosure requirement must be considered critically. It bears mentioning that, in the age of the Internet, much information is available to an inquisitive client in searching for an attorney.

38

Additionally, we question the correctness of the Appellate Division's suggestion that when LAD attorneys have not had experience with "similar cases," "consideration should be given to referring the case to a certified civil trial attorney." Id. at 242. Certainly, long experience handling discrimination cases is vitally important in assessing an attorney's capabilities. However, an attorney who has represented a client in one particular species of LAD cases may be no less capable of handling another species of such cases. We cannot say, for example, that an attorney who has handled multiple sex- and age-discrimination cases is not skilled or experienced enough to handle a race- or religious-discrimination case -- or a bullying case. In addition, without in any way diminishing the value or importance of the designation of certified civil trial attorney -- a special designation that signals that an attorney has recognized competence and experience as a litigator -- certification is a voluntary, lawyer-initiated process, and some of the finest attorneys in their respective fields have decided not to seek certification. See generally R. 1:39. And, there is no certification for the subspecialty of LAD cases. See ibid.

The Appellate Division, moreover, found "problematic" the provision in Cige's retainer agreement that calculated the contingent fee on the sum total of the award for damages and statutory attorney's fees. That method of calculation, however, may be relatively common and permissible. Indeed,

39

Balducci's successor attorney had the same provision in his retainer agreement for calculating the contingent fee. In addition, other jurisdictions have authorized that method of calculation. See, e.g., Cambridge Tr. Co. v. Hanify & King Prof'l Corp., 721 N.E.2d 1, 6 (Mass. 1999) (stating that there is "no authority that makes it per se unreasonable for an attorney and client to agree that the attorney is to be paid a percentage of a total award, which may include damages as well as court-awarded attorney's fees"); Prof'l Ethics Comm'n, State of Maine, Op. No. 81 (1987) (stating that "a fee agreement which included the fee itself in the base against which the contingency percentage is to be charged" is not "excessive per se"); North Carolina State Bar, Formal Ethics Op. 4 (2002) (allowing an attorney to "add the court-awarded attorney fee . . . to the judgment . . . and take a one-third contingent fee from the total").[3]

Last, the Appellate Division found "questionable the [retainer agreement's] additional fee of fifteen percent of one year's wages in the event a client who has lost a job based on discrimination is reinstated." Balducci, 456 N.J. Super. at 243. Cige evidently was using a form retainer agreement

---

[3] At oral argument before this Court, counsel for the New Jersey Association for Justice stated that an attorney may appropriately receive "the greater of the contingency, the fee that's awarded, or the combination," while counsel for the New Jersey State Bar Association suggested that such an arrangement would be limited by RPC 1.5.

because the present case did not involve a job loss. The reasonableness of such a provision applying in all discrimination cases, regardless of the financial recovery, may seem dubious. However, there may be employment-law cases in which the settlement provides only for reinstatement -- without any financial recovery, and without attorney's fees -- and therefore, it may be that in such a circumstance, a fee taken from a percentage of a year's salary would be reasonable.

All of the issues discussed above require careful and thoughtful consideration and deliberation. This Court generally establishes professional standards governing attorneys through the rulemaking process. Several Supreme Court committees have overlapping jurisdiction over the professional-responsibility issues raised in this opinion: the Civil Practice Committee, the Professional Responsibility Rules Committee, and the Advisory Committee on Professional Ethics. We have decided that the study of the professional-responsibility issues should be addressed by a newly established ad hoc committee comprised of representatives of those three committees, and of other representative members of the Bar and Bench with experience in these matters. We therefore will ask the Administrative Director of the Courts to select members for this committee for this Court's approval.

This committee of experienced judges and attorneys will make recommendations on the questions raised in this opinion. With the valuable input and insight from the committee, this Court then will be able to carefully survey all viewpoints and deliberate before considering any new rule of general applicability to the Bar.

The committee may also consider whether to revisit a cap on contingent fees in statutorily based discrimination and employment claims. See R. 1:21-7(c). We express no ultimate opinion on the matters referred to the committee.

## VII.

We affirm the judgment of the Appellate Division upholding the trial court's invalidation of the retainer agreement and its scheduling of a hearing to determine the quantum meruit value of Cige's attorney's fees. An ad hoc committee will be established to address the professional-responsibility issues discussed in this opinion. That committee will report its recommendations to the Court.


CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE ALBIN's opinion.